IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSEPH McANINCH, and | ) | |
| | ) | |
| SUSAN WINTERMUTE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 03-03285-CV-S-REL |
| THE KANSAS BANKERS SURETY CO. | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER *INTER ALIA* GRANTING DEFENDANT KBS'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF JOSEPH McANINCH'S MOTION FOR SUMMARY JUDGEMENT, DENYING PLAINTIFF SUSAN WINTERMUTE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Before the court is defendant The Kansas Bankers Surety Company's (KBS) second motion for summary judgment (Document No. 148), plaintiff Joseph McAninch's second motion for summary judgment (Document No. 152), and plaintiff Susan Wintermute's second motion for partial summary judgment (Document No. 151).[1] In support of its motion for summary judgment, defendant KBS states that the defense of charges brought against Damian Sinclair and Susan Wintermute do not constitute a loss that KBS is obligated to pay under the policy, since the loss did not arise by reason of a wrongful act as defined by the policy. KBS further argues that policy exclusions apply to

---

[1] Also before the court are the plaintiffs' respective motions to sever her case from Joseph McAninch's for the purpose of trial and various other pretrial motions and motions *in limine*. Because all of plaintiffs' claims are disposed of in this order, the following motions are denied as moot: Wintermute's motion to sever (Doc. No. 195); McAninch's motion to sever (Doc. No. 215); Wintermute's motion *in limine* (Doc. No. 203); McAninch's motion *in limine* (Doc. No. 206); KBS's motion *in limine* (Doc. No. 208); Wintermute's motion to strike (Doc. No. 217); and Wintermute's motion to amend (Doc. No. 222).

Case 6:03-cv-03285-REL   Document 227   Filed 05/25/05   Page 1 of 129

exclude coverage in this case. Regarding Wintermute's separate tort claim for malicious interference in her criminal defense, KBS argues that Wintermute cannot prove the elements of *prima facie* tort, and so her claim fails as a matter of law. Regarding McAninch's separate tort claim for defamation, KBS argues that Damian Sinclair's claim abated on his death, and that there has been no showing that the contested statements are untrue or were published.

Plaintiff McAninch argues that KBS waived or is estopped from asserting any defense to coverage. McAninch states that KBS "insured over" certain Memoranda of Understanding and other documents filed by federal regulatory agencies, which he argues constitute a continuing claim under both the Directors, Officers, & Employees Indemnity Policy (D&O Policy) at issue in this case, and a separate Crime Bond Policy indemnifying the bank for losses sustained due to criminal acts of its employees and officers. Regarding his claim for defamation, McAninch argues that the claim arose prior to Damian Sinclair's death, and that KBS should not be allowed to assert the defense of truth in connection to "actions which were wrong in the first place, i.e., denial of a defense and coverage."

Plaintiff Wintermute argues that she is entitled to coverage for losses sustained in connection to her criminal defense because such losses are covered under the terms of the policy. She argues that the policy's definition of "wrongful act" is ambiguous, and so must be construed in favor of the insured. She argues, further, that issues of material fact preclude summary judgment on her malicious interference claim.

# I. STANDARD FOR SUMMARY JUDGMENT

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The movant bears the burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant does not bear the burden of proof at trial, that party must show "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When considering summary judgment motions, the court is to believe the evidence of the non-movant and draw all reasonable inferences in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

# II. FACTS

Based on the parties' suggestions and the relevant affidavits and exhibits, I find the following undisputed material facts:[2]

1. **Plaintiff Joseph W. McAninch is the Administrator of the Estate of Damian Sinclair. Damian Sinclair died of natural causes on December 4, 2003.** This fact is reflected in the amended complaint and is not disputed by the parties.

2. **Plaintiff Susan Wintermute a/k/a/ Susan Sinclair is the former wife of Damian Sinclair.** This fact is reflected in the amended complaint and is not disputed by the parties.

---

[2] Paragraphs 1-19 of this section represent the factual findings of this court in reference to the parties' first motions for summary judgment. (See Document No. 138.) The parties have adopted these facts in their respective second motions for summary judgment, except as noted above.

3.      **Defendant KBS is a Kansas corporation engaged in business as an insurance company with its principal place of business located in Topeka, Kansas.** This fact is reflected in the notice of removal and is not disputed by the parties.

4.      **Damian Sinclair and Susan Wintermute were the principal shareholders of Sinclair National Bank, Gravette, Arkansas.** This fact is reflected in numerous documents, including the amended complaint, and is not disputed by the parties.

5.      **KBS issued Directors, Officers and Employees Indemnity and Bank Lender Liability Policy DL 1859 AR (D&O Policy) to Sinclair National Bank, Gravette, Arkansas, for the policy period October 7, 2000, to October 7, 2001. Damian Sinclair and Susan Sinclair were listed as directors of the Bank in the application of insurance.** This fact is reflected in the written D&O Policy and attached application for insurance and is not disputed by the parties.

6.      **The D&O Policy provided that KBS shall indemnify each Bank director, officer, or employee "for personal Loss which the Director or Officer or Employee is legally obligated to pay by reason of any Wrongful Act solely in their capacities of Director or Officer or Employee of the Bank which is first Discovered during the Policy Period.** This fact is reflected in the written D&O Policy and is not disputed by the parties.

7.      **"Discovery" is defined in the policy as occurring "when any Director or Officer or Employee first becomes aware of facts which would cause a reasonable person to assume that a Loss covered by the policy has been or**

4

will be incurred, even though the exact amount or details of the Loss may not then be known. All Loss involving the same acts or interrelated acts shall be deemed to have been Discovered at the time of first Discovery." This fact is reflected in the written D&O Policy and is not disputed by the parties.

8.     **"Loss" is defined, in relevant part, as meaning "any amount which the Directors or Officers or Employees are legally obligated to pay… for a claim or claims made against the Directors or Officers or Employees for Wrongful Acts and shall include but not be limited to damages, judgments, settlements and costs, cost of investigation… and defense of legal claims… except as excluded from coverage under Section IV."** This fact is reflected in the written D&O Policy and is not disputed by the parties.

9.     **On September 7, 2001, Sinclair National Bank, Gravette, Arkansas was closed by the Office of the Comptroller of the Currency (OCC) and the Federal Deposit Insurance Corporation (FDIC) was appointed Receiver of its assets.** This fact is reflected in numerous affidavits and documents, including the amended complaint, and is not disputed by the parties.

10.     **KBS advised Sinclair National Bank by letter dated September 11, 2001, that it was unwilling to renew the D&O Policy, and the policy would expire by its terms on October 7, 2001.** This fact is reflected in the September 11, 2001, letter and is not disputed by the parties.

11.     **By letter dated September 26, 2001, Eli Greenburg, attorney, of Wolf Haldenstein Adler Freeman & Herz first advised KBS that possible claims might be asserted by the FDIC against officers and directors of Sinclair**

National Bank. The letter specifically stated that "The FDIC has provided oral, informal notice that there may be claims against the officers and directors of Sinclair National Bank for negligence, breach of fiduciary duty and possibly other wrongful conduct." The letter specifically named plaintiffs Damian Sinclair and Susan Sinclair, among others, as individuals against whom claims may be made.** This fact is reflected in the September 26, 2001, letter and is not disputed by the parties.

12.     **By letter dated September 27, 2001, Helen Davis Chaitman, attorney, of Wolf Haldenstein Adler Freeman & Herz, gave notice to KBS that her law firm received a subpoena from the OCC demanding production of files of the officers and directors.** This fact is reflected in the September 27, 2001, letter and is not disputed by the parties.

13.     **On September 28, 2001, Charles M. Towle, Vice President of KBS, spoke with Helen Davis Chaitman by telephone and advised her that the D&O Policy did not provide coverage for any future claims made against any officer or director of Sinclair National Bank by the OCC or the FDIC or any state or federal officials or agencies.** This fact is reflected in the affidavit of Charles M. Towle and is not disputed by the parties.

14.     **By letter dated October 8, 2001, Charles M. Towle wrote Helen Davis Chaitman upon receipt of the September letters from her law firm and advised Ms. Chaitman as discussed in their telephone conversation that Exclusion No. 3 of the D&O Policy would apply to exclude coverage for any future claims made against the directors and officers of Sinclair National**

6

Bank by the FDIC or OCC and any other state or federal officials or agencies. The letter states in part:

> "As we discussed on the phone on September 28, 2001, the policy No. DL 1859 AR, Section IV, Exclusion (3) states:
>> 'The Underwriter shall not be liable to make any payment or provide any defense in connection with any claim for Loss made against the Bank or Directors or Officers or Employees:
>>> 3) by any State or Federal official or agency, including by not limited to the Federal Deposit Insurance Corporation, whether such official or agency is acting as receiver, liquidator, supervisor, regulator, or in any other capacity;'
>> If any party, other than a State or Federal official or agency brings any actions against any director, officer, or employee of Sinclair National Bank, please let us know promptly."

This fact is reflected in the October 8, 2001, letter and is undisputed by the parties.

15.    **KBS's next communication with attorneys for Sinclair National Bank regarding the D&O Policy was its receipt of the Petition that was filed in this action in the Circuit Court of Green County, Missouri, by Damian Sinclair on June 18, 2003.** This fact is undisputed by the defendant and plaintiff Wintermute. Plaintiff McAninch does not adopt this statement in his second motion for summary judgment. He attempted to deny this statement in his initial motion for summary judgment, but referenced a letter that concerned a bond policy not at issue in this lawsuit. McAninch offers no additional evidence to support his allegation that a communication regarding the D&O Policy occurred prior to July 18, 2003. I therefore find this fact undisputed for the reasons discussed in my initial summary judgment order.

16.     **On September 17, 2003, Susan Wintermute was indicted by a federal grand jury on charges of conspiracy and making false statements. On November 20, 2003, a nine-count superceding indictment was returned, charging Susan Wintermute with conspiracy, making false statements, illegal participation misapplication of bank funds, and two counts of bank fraud. The superceding indictment charged Damian Sinclair with these crimes, plus an additional count of making false statements and obstructing examination of a financial institution. Charges were also brought against an individual named Clarence Stevens.** These facts are reflected in the original federal indictment and the superceding federal indictment, which have been judicially noticed by this court, and are undisputed by the parties.

17.     **By letter dated September 25, 2003, William McDonald, attorney for Damian Sinclair, advised KBS that an indictment was filed by the State of Missouri against Damian Sinclair on September 12, 2003. The letter further advised that an indictment was filed by the United States of America against Susan Wintermute on September 17, 2003. The state indictment against Damian Sinclair charged him with 24 counts of securities fraud. Following Damian Sinclair's death on December 4, 2003, the state indictment and the superceding federal indictment against him were dismissed.** This fact is reflected in the September 25, 2003, letter and is not disputed by the parties.

18.     **By letter dated September 30, 2003, Charles M. Towle responded to Mr. McDonald. The letter states in part:**

8

> "The Directors, Officers, and Employees Indemnity and Bank Lender Liability Policy does not protect the Directors and Officers from accusations of criminal acts made by the government.
> The policy, Section IV, Exclusion (3) states:
>> 'The Underwriter shall not be liable to make any payment or provide any defense in connection with any claim for Loss made against the Bank or Directors or Officers or Employees:
>>> 3) by any State or Federal official or agency, including by not limited to the Federal Deposit Insurance Corporation, whether such official or agency is acting as receiver, liquidator, supervisor, regulator, or in any other capacity;'
>> The Indictments are claims made by a State and Federal official or agency in any other capacity. There is no coverage under the policy for the defense of Mr. Sinclair or Ms. Wintermute with respect to these Indictments."

This fact is reflected in the September 30, 2003, letter and is not disputed by the parties.

19.     **On August 4, 2004, Wintermute was convicted of Counts I and II of the superceding indictment: conspiracy to file a false statement and filing a false statement in connection with her application for a change in control of the Bank. She was acquitted of Counts IV, VI, VII, and VIII of the superceding indictment, as well as the charges in Count I of conspiracy to commit those offenses. Count IX was dismissed by the court after the return of the verdict because Wintermute had been acquitted of the counts on which Count IX depended.**

This fact is reflected in the affidavit of Susan Wintermute and is not genuinely disputed by the parties. KBS renews its objections to Wintermute's characterizations of the convictions and acquittals. Those characterizations have been removed from the above statement of fact, so that only facts supported by the Judgment and Commitment remain.

20.    **Wintermute has incurred legal fees and costs in defending herself against the criminal charges on which she was acquitted.** This fact is reflected in the affidavit of Susan Wintermute and is not genuinely disputed by the parties. KBS disputes any implication that the fees incurred specifically relate to a covered event under the policy or are covered under the policy. This is an issue of contract interpretation and a question of law, and will be addressed in the Discussion section of this order, below.

*A. KBS'S Proffered Facts*

21.    **Two subpoenas were served upon Charles Towle to appear at the criminal trial of Susan Wintermute. The first subpoena directed Mr. Towle to appear for trial in Springfield, Missouri. The second subpoena directed Mr. Towle to appear for trial on July 20, 2004, in Kansas City, Missouri.** This fact is supported by the affidavits of Ann Hoover and Charles Towle and is not disputed by the parties.

22.    **Charles Towle also received a letter from Devon Sherwood dated June 29, 2004, requesting he contact Mr. Sherwood of dates Mr. Towle was available to testify between July 19 and August 19, 2004.** This fact is supported by an authenticated copy of the July 29 letter and is not disputed by the parties.

23.    **Charles Towle had conflicts with many dates referenced in the correspondence and because KBS was defending itself in the instant civil case, provided subpoenas and correspondence to KBS attorneys to contact Mr. Sherwood.** This fact is supported by the affidavit of Charles Towle and is not disputed by the parties.

24.     **Ann Hoover sent correspondence to Devon Sherwood on behalf of Mr. Towle. Defendant states that the purpose of this correspondence was to have questions answered about the subpoenas. Mr. Towle authorized an offer be made to Mr. Sherwood that KBS would produce a copy of the insurance file in response to the subpoena without his attendance at Ms. Wintermute's trial.** These facts are supported by authenticated documents and the affidavits of Ann Hoover and Charles Towle and are not disputed by the parties.

Plaintiff Wintermute disputes that this was the sole purpose of the correspondence, however KBS did not assert that the sole purpose was to have questions answered. Wintermute states that it is unclear what "insurance file" was authorized to be produced. In his July 14 letter, Devon Sherwood requested "all documents concerning the FDIC claim that it had losses due to loans involving … Susan Wintermute." (Document No. 40 at 20.) In response to that letter, Ann Hoover wrote that "Kansas Bankers Surety received a Proof of Loss on September 10, 2001, that references loan loss and correspondence." (Document No. 40 at 21.) In that same letter, Ms. Hoover asked, "As an alternative to Mr. Towle's appearance at the criminal trial with these documents, will you agree to our production of copies of these documents to you?" (Document No. 40 at 21.) Mr. Sherwood responded that he would like the documents previously requested. (Document No. 40 at 22.) He also indicated that he would agree to Ms. Hoover's proposal if the government would stipulate to the documents. (Document No. 40 at 22.) No further communication between Ms. Hoover and Mr. Sherwood has

been submitted into evidence. Wintermute's objections to this factual statement—both expressed and implied—are therefore overruled.

25. **Mr. Towle and his legal counsel could not be present on July 20, 2004, for Wintermute's trial.** This fact is supported by the affidavit of Charles Towle and is not disputed by the parties for the purpose of summary judgment.

26. **When KBS attorneys were unable to obtain the stipulation proposed by Mr. Sherwood in his fax correspondence of July 16, 2004, they contacted the Honorable Scott O. Wright's chambers on July 19, 2004, and spoke with Hadi Al-Shathir. Mr. Al-Shathir asked that a copy of the Motion to Quash be faxed to him when it was filed and served upon legal counsel that day. In a later telephone call of July 19, 2004, Mr. Al-Shathir called Ann Hoover and told her that due to other pending motion, the Motion to Quash would be taken under advisement and it would not be necessary for Charles Towle to appear for trial on July 20, 2004, as reflected on the subpoena. Mr. Al-Shathir told Ms. Hoover he would advise her of the Court's ruling on the Motion to Quash Subpoena when Judge Wright ruled at a later date.** Plaintiff Wintermute objects to consideration of these conversations on the grounds of hearsay. The statements are not offered for truth of the matter asserted, however. Plaintiff's objections are overruled. This fact is supported by the affidavit of Ann Hoover and is not disputed by the parties.

27. **On the morning of July 26, 2004, April Allen, legal assistant to Devon Sherwood, called Ann Hoover and told her that Charles Towle was to appear at 1:30 p.m. on July 29, 2004, at Susan Wintermute's trial to testify. Later in**

the afternoon of July 26, 2004, Ann Hoover was called by Mr. Sherwood's associate and told that Mr. Towle was to appear at 1:30 p.m. on July 29, 2004. Ms. Hoover never received an Order from the Court on the Motion to Quash. This fact is supported by the affidavits of Ann Hoover and is not disputed by the parties.

28.     **Charles Towle and Ann Hoover appeared at Susan Wintermute's criminal trial on July 29, 2004. They traveled together to Kansas City and were present in the courthouse from approximately 1:15 p.m. until 5:05 p.m. after the jury was discharged for the day. Charles Towle took his insurance file with him. He was present and available to testify with the KBS insurance file at Susan Wintermute's criminal trial on the afternoon of July 29, 2004. Susan Wintermute's attorneys did not call him to testify.** This fact is supported by the affidavits of Ann Hoover and Charles Towle and is not disputed by the parties for the purpose of summary judgment.

29.     **Charles Towle wrote a letter to William McDonald dated September 30, 2003, after receipt of Mr. McDonald's letter dated September 25 2003, setting forth a demand for coverage on behalf of Damian Sinclair.** This fact is supported by the affidavit of Charles Towle and is not disputed by the parties. Plaintiff McAninch states that this paragraph fails to provide the full context or meaning of attorney Mr. McDonald's September 25 letter or Charles Towle's September 30 letter. These issues are more fully discussed in plaintiff McAninch's proffered facts, below.

Case 6:03-cv-03285-REL   Document 227   Filed 05/25/05   Page 13 of 129

30. **Charles Towle never published or disseminated the contents of any written correspondence he sent to Mr. McDonald or Mr. McDonald sent to him regarding Mr. McDonald's clients.** This fact is supported by the affidavit of Charles Towle. Plaintiff McAninch disputes this fact and states that "the letter itself shows that it was sent to attorney Ann Hoover and does not show who typed it." The September 30 letter was copied to KBS attorney Ann Hoover. Plaintiff McAninch does not offer any evidence to dispute Mr. Towle's statement that he never published or disseminated the letter. I therefore find that this fact is undisputed.

31. **Charles Towle never stated Damian Sinclair was criminally dishonest**. Plaintiff McAninch objects to this proffered fact as vague, ambiguous, and confusing. McAninch denies the statement as written, but offers no evidence to establish a genuine dispute of this fact. I therefore find that this fact is undisputed.

32. On October 19, 2004, the Office of the Comptroller of the Currency, Department of the Treasury and United States of America released Stipulation and Consent Order #2004-98 *In the Matter of Helen Davis Chaitman*, that involves contentions that Respondent, as outside counsel for Sinclair National Bank, caused the Bank to (1) violate one or more laws or regulations, including 12 U.S.C. §1828 (k), (2) to violate a prompt corrective action directive ("PCA") delivered to the Bank on August 9, 2001, and (3) to improperly pay for legal services rendered to the majority shareholder of the Bank. This fact is supported by a document in the record which purports to be a copy of the Stipulation and Consent Order #2004-98. The document is not properly authenticated under Fed.

R. Evid. 901(b)(7) with evidence that the document is a public record and is from the office where the original is kept, or Fed. R. Evid. 902(4), by certification by a public official. I therefore do not find that this is an undisputed fact.

33.     On November 30, 2004, the Office of the Comptroller of the Currency, Department of the Treasury, and United States of America released Stipulation and Consent Order #2004-140/Case Number AA-EC-04-94, In the Matter of Wolf Hadderstein Adler Freeman & Herz, LLP, that involves contentions that the Firm failed to adequately supervise a former partner principally handling the Firm's representation of Sinclair National Bank, Gravette, Arkansas, and improperly charged and received payment from the Bank for certain legal work conducted by the Firm for the benefits of clients other than the Bank. The Firm, in restitution, paid $90,000.00 to the FDIC, as receiver for Sinclair National Bank, and agreed to follow procedures designated in the Order prior to undertaking representation of insured depository institutions. This fact is supported by a document in the record which purports to be a copy of the Stipulation and Consent Order #2004-140. The document is not properly authenticated under Fed. R. Evid. 901(b)(7) with evidence that the document is a public record and is from the office where the original is kept, or Fed. R. Evid. 902(4), by certification by a public official. I therefore do not find that this is an undisputed fact.

*B. Susan Wintermute's Proffered Facts*

34.     **The superceding indictment returned on November 20, 2003, contains seven counts against Wintermute, of which Count Two (false statements) and**

**one-fifth of Count One (conspiracy to make false statements) relate to conduct that pre-dates Wintermute's appointment as director of the Bank.**

Defendant KBS objects to this statement of fact, incorporating by reference its response to Wintermute's first motion for summary judgment, in which defendant asserted that the federal indictment speaks for itself. I find that the characterizations of each individual charge in the indictment offered by plaintiff Wintermute are disputed. However, in reading the indictment, it is clear that, although an extensive history of the case and plaintiff's alleged conduct prior to her becoming an officer of the Bank is discussed in the indictment, five of the seven offenses charged relate to conduct allegedly occurring after Wintermute's appointment as a director of the Bank. This fact is reflected in the superceding indictment and I find it is not genuinely disputed by the parties.

35. **Despite demand for coverage, KBS declined coverage and refused to indemnify Wintermute.**

In support of this statement, plaintiff cites to ¶18 of this court's February 28, 2005, order on the parties' first motions for summary judgment. I made no such finding in ¶18 of that order. The paragraph cited by the plaintiff simply quotes a portion of a letter dated September 30, 2003, from Charles Towle to William McDonald. The letter itself, however, responds to a September 25, 2003, letter from Mr. McDonald, alerting KBS to state and federal indictments against Damian Sinclair, Susan Wintermute, and another individual. In addition to the language quoted in ¶18, the September 30 letter from Charles Towle discusses five additional bases for denial of coverage to provide a defense of plaintiffs with

16

respect to the criminal indictments. Those bases for denial of coverage included the following policy provisions: Exclusions (8), (11), and (14); Insuring Agreement (A) and the Policy definition of "Wrongful Act;" and the requirement under Section VI(b) that the allegations, if establish, constitute a collectible Loss under the policy. This letter is clearly denying coverage and refusing to indemnify plaintiff Wintermute. Defendant KBS does not offer any evidence to establish a genuine dispute of this fact. I therefore find the fact undisputed.

36.      **On March 30, 2004, Helen Davis Chaitman wrote to Charles Towle as follows:**

> **In the fall of 2001, you sent me a copy of the September 7, 2001, proof of loss filed against the above Bond in the amount of $838,884.22 by the Federal Deposit Insurance Corporation because I had represented Sinclair National Bank. After the Bank was closed, I represented Damian Sinclair. In order to assist you, I sent you a letter explaining the facts pertinent to the FDIC's claim. I am writing to ask you two favors:**
> **First, I no longer have access to my copy of the letter I sent. Would you be kind enough to send me, at my expense, a copy of my letter with the exhibits I sent you.**
> **Second, would you be good enough to let me know what the ultimate disposition was of the FDIC's claim?**
> **Thank you very much.**

This fact is reflected in a properly authenticated copy of the March 30 letter and is not disputed by the parties. KBS objects to the relevance of this fact, stating that the letter does not reflect that Ms. Chaitman represents Susan Wintermute or was written on her behalf. I find that this fact is relevant, and so overrule KBS's objection.

37.      **On April 13, 2004, Ms. Chaitman wrote again to Towle as follows:**

> **In my letter to you of March 30, 2004, I asked you for a copy of a letter I sent to you explaining the facts pertinent to the FDIC's claim regarding the above Bond. I am writing to you again to ask if you would be kind enough to send me a copy of this letter along with the accompanying exhibits. Also, would you be good enough to let me know what the ultimate disposition was of the FDIC's claim?**
> **Thank you very much.**

This fact is reflected in a properly authenticated copy of the April 13 letter and is not disputed by the parties. KBS objects to the relevance of this fact, stating that the letter does not reflect that Ms. Chaitman represents Susan Wintermute or was written on her behalf. I find that this fact is relevant, and so overrule KBS's objection.

38. **On April 16, 2004, Ann Hoover wrote to Ms. Chaitman as follows:**

> **Your recent correspondence to my client Kansas Bankers Surety Company has been referred to me for response. I suggest you contact your former law firm, Wolf, Haldenstein, Adler, Freeman & Herz, LLP to obtain copies of correspondence you request. We will not provide you with copies or respond to your inquiry.**

This fact is reflected in a properly authenticated copy of the April 16 letter and is not disputed by the parties. KBS objects to the relevance of this fact. I find that this fact is relevant, and so overrule KBS's objection.

39. **Following receipt of this letter, Ms. Chaitman tried on several occasions to reach Ms. Hoover by telephone. Ms. Hoover did not take any of the telephone calls and the two attorneys did not speak.** This fact is reflected in the certification of Helen Davis Chaitman. KBS does not dispute that the two attorneys did not speak, and does not offer any evidence to contradict the above fact as written. Wintermute's original proffered fact stated that "Hoover would

18

not take any of [Chaitman's] calls." The implication of a deliberate refusal on Ms.

Hoover's part is not supported in the certification, or any other evidence of

record. I find that the fact, as reflected above, is undisputed.

40.     **On April 21, 2004, Ms. Chaitman wrote to Ms. Hoover as follows:**

> **Dear Ms. Hoover:**
> **I was rather surprised to receive your curt letter and surprised even more that you would not return my several phone calls. I am no longer with Wolf Haldenstein and don't have access to the file. That is why I wrote to Mr. Towle and asked him if he would be good enough, at my expense, to make a copy of my letter to him with exhibits. In fact, I was kind enough to take a great deal of time to put together my letter (dated on or about September or October 2001) for the benefit of your client. I would think, as a matter of simple courtesy, if not gratitude, Mr. Towle would comply with this simple request. What am I missing? Have I done something to offend you?**

This fact is reflected in a properly authenticated copy of the April 21 letter and is

not disputed by the parties. KBS objects to the relevance of this fact, stating that

the letter does not reflect that Ms. Chaitman represents Susan Wintermute or was

written on her behalf. I find that this fact is relevant, and so overrule KBS's

objection.

41.     **Ms. Hoover never responded to Ms. Chaitman's April 21, 2004, letter.**

This fact is reflected in the certification of Helen Davis Chaitman and is not

disputed by the parties. KBS objects to the relevance of this fact. I find that this

fact is relevant, and so overrule KBS's objection.

42.     **The subpoena served on Charles Towle on July 7, 2004, required Mr.**

**Towle to bring with him KBS's file relating to the Crime Bond.** This fact is

reflected in the subpoena and is not disputed by the parties.

43. **In response to the subpoena, Ms. Hoover wrote a letter to Devon Sherwood on July 14, 2004, in which she wrote the following:**

> We fail to see how Mr. Towle's testimony or any KBS documents would be relevant to these criminal trial proceedings.
>
> Without waiving any other arguments which could be presented in a proposed motion to quash the subpoena, it appears the request for documents is certainly objectionable on the grounds that the subpoena fails to specifically describe the documents sought. Inasmuch as Mr. Towle's personal knowledge is limited to insurance matters subject to the pending civil suit, your position as to the scope of his intended testimony or the relevance of any particular KBS documents would be appreciated.

This fact is reflected in the July 14 letter and is not disputed by the parties.

44. **On July 14, 2004, Mr. Sherwood responded to Ms. Hoover's letter by fax, writing as follows:**

> I am interested in all documents concerning the FDIC claim that it had losses due to loans involving my client, Susan Wintermute. It is our belief that the FDIC purposefully inflated the claim. There is also the matter of a listing of the loans provided to Mr. Towle showing the minor loss (if any) involved. I think it was provided by a Ms. Chaitman, an east coast lawyer. The degree of loss is, of course, relevant.

This fact is reflected in the July 14 letter and is not disputed by the parties.

45. **Ms. Hoover wrote to Mr. Sherwood on July 16, 2004, and repeated her prior statement that "Mr. Towle's knowledge is limited to insurance matters that are presently being litigated in the civil litigation pending before The Honorable Robert E. Larsen…" Mr. Towle was copied on this letter from Ms. Hoover.** This fact is reflected in the July 16 letter and is not disputed by the parties.

46.     **In her July 16, 2004, letter, Ms. Hoover stated to Mr. Sherwood that she and KBS "assume you have copies of the correspondence from your client's attorneys."** This fact is reflected in the July 16 letter and is not disputed by the parties. Wintermute also states that Ms. Hoover was referring to the October 5, 2001, letter from Helen Davis Chaitman to Charles Towle. KBS objects, stating that Ms. Hoover's statement was not limited to the correspondence referenced. I find that the letter speaks for itself, and the characterization offered by Wintermute is not supported in the letter.

47.     **That same day, Mr. Sherwood sent a fax memo to Ms. Hoover, stating: "[F]irst of all, I do not know anything about the case you referenced, *Sinclair v. The Kansas Bankers Surety Co*. I would like the documents I have previously requested. In answer to the 1st paragraph, I would agree to that if the government would stipulate the documents, but I would need that on tap first."** This is reflected in the July 16 memo and is not disputed by the parties.

48.     **On July 19, 2004—the first day of the criminal trial—Ms. Hoover, on behalf of KBS and Towle, filed a motion to quash the subpoena on the ground that the commands of the subpoena are unreasonable and oppressive.** This fact is reflected in KBS's motion to quash and is not genuinely disputed by the parties. KBS objects that the motion speaks for itself and is not limited to the grounds stated. The above language tracks the language in KBS's motion to quash, however, and does not mischaracterize the motion or the grounds stated. I therefore find no genuine dispute of this fact.

49.     **KBS's motion to quash contains the following statement:**

> **Charles Towle has no personal knowledge of the underlying conduct. Rather, his involvement is limited to the decision regarding insurance coverage under a Directors and Officers Liability policy, which is the subject of a pending civil action filed in this court. <u>Sinclair v. Kansas Bankers Surety Co</u>., Case No. 03-3285-REL.**

This fact is reflected in the motion to quash and is not disputed by the parties.

50.    **The Court did not issue a written order on KBS's motion to quash the subpoena.** This fact is reflected in the affidavit of Ann Hoover and the public docket sheet of *USA v. Wintermute, et al*., 03-03125-01/03-CR-S-SOW and is not disputed by the parties.[3]

51.    **On the morning of July 26, 2004, April Allen, legal assistant to Devon Sherwood, called Ann Hoover and told her that Charles Towle was to appear at 1:30 p.m., on July 29, 2004, at Wintermute's criminal trial to testify. Later in the afternoon of July 26, 2004, Hoover was called by Mr. Sherwood's associate and told that Towle was to appear at trial at 1:30 p.m. on July 29, 2004.** This fact is reflected in the affidavit of Ann Hoover and is not disputed by the parties.

52.    **Ms. Hoover claims that, on July 29, 2004, she and Mr. Towle came to the federal courthouse and spoke to an "unidentified person." According to Ms. Hoover, they say on a bench outside the courtroom where Ms. Wintermute was on trial for the entire day. They never identified themselves to Devon Sherwood or to Wintermute and Mr. Sherwood concluded Wintermute's defense without the benefit of the KBS file relating to the**

---

[3] The docket sheet of the criminal trial reflects that KBS's motion to quash was terminated by a court official on July 21, 2004, after a series of pretrial conferences. Nothing in the court record reflects whether the court ruled on the motion to quash.

**Crime Bond or Mr. Towle's testimony.** Defendant does not dispute that Ms. Hoover and Mr. Towle came to the courthouse for Wintermute's criminal trial and never spoke to Mr. Sherwood or Wintermute. KBS objects to the remainder of this factual statement as argument that should not be considered. I do not find that the factual statement is argument. It is supported by the affidavits of Ann Hoover, Charles Towle, Devon Sherwood, and Susan Wintermute and is not genuinely disputed by the parties.

53. **On February 14, 2005, Wintermute filed a motion to compel KBS to produce documents responsive to Wintermute's written document demand.** This fact is reflected in Wintermute's motion to compel and is not disputed by the parties.

54. **Wintermute specifically sought the production of documents relating to the Crime Bond issued by KBS to Sinclair National Bank. These were the documents for which Wintermute's criminal trial counsel, Devon Sherwood, had issued the subpoena.** This fact is reflected in Wintermute's motion to compel and is not disputed by the parties.

55. **On March 3, 2005, this court ordered KBS to produce all responsive documents for in camera inspection.** This fact is reflected in the March 3 order of this court and is not disputed by the parties.

56. **On March 11, 2005, the court granted in part Wintermute's motion to compel and ordered KBS to produce 525 pages of documents.** This fact is reflected in the March 11 order and is not disputed by the parties.

57.     Among the 525 pages of documents is a September 7, 2001, a Proof of Loss filed in the name of Sinclair National Bank stating that Damian Sinclair (but not Susan Wintermute) had committed criminal acts. Defendant disputes this statement, arguing that the September 7 document was not a "Proof of Loss," and that the document references conduct by both Damian and Susan Sinclair (a.k.a. Susan Wintermute). Whether the document is a Proof of Loss or simply a purported Proof of Loss has no legal significance in this case. The document attributes losses in the amount of $838,884.22 to the "dishonest actions of Damian Sinclair." It proceeds to describe conduct allegedly performed by both Damian Sinclair and Susan Sinclair. The document does not characterize Damian Sinclair's conduct as "criminal." To the extent it attributes "criminal conduct" to Damian Sinclair, it also attributes the same conduct to his wife Susan Sinclair. I therefore find that this fact is disputed.

58.     The Proof of Loss was submitted to KBS with 103 pages of documents. KBS disputes that the document was a proof of loss and states that it was submitted with a letter from the Bank and approximately 127 pages of documents. **I find that it is undisputed that the document purporting to be a Proof of Loss was submitted with in excess of 100 pages of documents.**

59.     **The 525 pages of documents includes communications between Charles Towle and the FDIC concerning the Proof of Loss.** This fact is reflected in the certification of Helen Davis Chaitman and is not disputed by the parties.

*C. Joseph McAninch's Proffered Facts*

60.     Northwestern National Bank (NWNB) was a national charter bank formed in 1994. **NWNB had its main office at Gravette, Arkansas and a facility at Bella Vista, Arkansas.**

        In support of this statement, plaintiff McAninch cites to "JM Ex. 16 McDonald Affidavit" and "Exs. 2 and 3 February 8, 2005 Deposition of Donald M. Towle." JM Ex. 16 is an exhibit offered in support of McAninch's first motion for summary judgment, attached to an affidavit in support of that motion (Document No. 60). It purports to be a copy of an August 16, 2001, letter "Notification of PCA [Prompt Corrective Action] Capital Category" from an officer at the OCC to the Board of Directors of Sinclair National Bank. Nothing in the letter or the unidentified documents attached supports the above factual statement.   Exhibits 2 and 3 of the Donald Towle deposition are an annual application and renewal form for NWNB, which show that the bank's business address was in Gravette, Arkansas, and that another branch was located in Bella Vista, Arkansas. Exhibits 2 and 3 do not support the proffered statement that NWNB was a national charter bank formed in 1994, a fact which defendant contests, saying that it issued bond and policies for NWNB beginning in 1996.

        Moreover, as I held in my February 28 order ruling on the first motions for summary judgment, plaintiff failed to properly authenticate JM Ex. 16, as well as JM Ex. 3, 4, 10, 12, 13, 14, 15, 18, and 20. The affidavit of William McDonald simply states that "JM Ex. 16 is to the best of my knowledge and belief a true and accurate copy of the August 9, 2001 OCC Notification of PCA Capital Category

found in the SNB business files retained by Damian Sinclair." (Document No. 60 at 6.) This type of certification by an attorney is inadequate to establish the authenticity of a business record or written correspondence.

Finally, even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

61.    NWNB was at all times material herein bank insured and crime bonded by defendant KBS.

In support of this statement, plaintiff McAninch cites to "JM Ex. 19 McDonald Affidavit," and the D. Towle deposition, page 9, lines 23-25, and page 10, lines 1-24. Exhibit 19 purports to be a cover sheet to Crime Bond No. 3661AR, D&O Policy No. DL9841AR, and Bank Employment Practices Policy EP5632AR, issued by KBS to NWNB for the policy period October 7, 1999, to October 7, 2000. This document is not properly authenticated in the affidavit of William McDonald, however defendant KBS does not specifically object to the exhibit on authentication grounds. Defendant states that the exhibits referenced do not support the above factual statement. The cover sheet is not signed by any KBS officer and has no legal effect in terms of verifying the insurance and bond

coverage of NWNB. Defendant does not dispute that it issued bonds and policies to NWNB beginning in 1996.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair that originated during defendant's coverage of NWNB, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

62.     NWNB was examined by the Joplin, Missouri field office of the Office of Comptroller of Currency (OCC) in 1998.

In support of this statement, plaintiff cites to Ex. 1 of the D. Towle deposition. Exhibit 1 purports to be a copy of a Memorandum of Understanding between Northwest National Bank and the OCC, issued on December 14, 1998. This exhibit has not been properly authenticated and, in fact, was not directly referenced or identified at any time during the deposition of Donald Towle.

Defendant KBS objects to the relevance of this factual statement. Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is

estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

63.     The aforesaid examination resulted in an October 21, 1998 OCC Report of Examination.

I find that this fact is disputed, based on unauthenticated evidence, and irrelevant to the case at bar, for the reasons discussed above.

64.     The aforesaid October 21, 1998 Report of Examination resulted in an OCC Memorandum of Understanding (MOU) dated December 14, 1998, which was signed by, agreed to, and binding on all members of the NWNB Board of Directors.

In support of this statement, plaintiff cites to the unauthenticated Ex. 1 of the D. Towle deposition. Plaintiff also states that KBS admitted to this statement of fact in Doc. No. 74, which plaintiff refers to as defendant's response to plaintiff McAninch's motion for summary judgment. In fact, Doc. No. 74 is KBS's reply to McAninch's response to KBS's motion for summary judgment. Contrary to plaintiff's contention, paragraphs 4 and 6 of that reply do not contain an admission to the above factual statement. In paragraph 5, defendant KBS responds to a proffered statement identical to the above, contesting that statement in part. Defendant does not dispute the statement itself, but disputes any implication that KBS had knowledge of the contents of the MOU prior to this litigation.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is disputed in part, based on unauthenticated evidence, and irrelevant to the case at bar.

65.     By the MOU's terms, the MOU imposed duties on the Board of NWNB which the Board owed to NWNB.

In support of this statement, plaintiff cites to the unauthenticated Ex. 1 of the D. Towle deposition. Plaintiff also states that defendant KBS admitted to this fact in Doc. No. 74. Defendant does not contest this statement, but objects to its relevance and states that it had no knowledge of the contents of the MOU prior to disclosure during this litigation.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is undisputed, but based on unauthenticated evidence, and irrelevant to the case at bar.

66.    The existence of the MOU was disclosed to defendant KBS in the 1999 KBS crime bond "Annual Application and Renewal Form" signed by "Marc Wolin, Pres." of NWNB, for defendant KBS coverage under KBS Crime Bond No. 3661AR for policy period October 7, 1999, to October 7, 2000.

In support of this statement, McAninch cites to NWNB's Annual Application and Renewal Form from the year 1999, Ex. 2 of the D. Towle deposition, and the section of the deposition in which Donald Towle identified that exhibit. Defendant disputes this statement in part, pointing out that there is no specific reference to the contents of the MOU as the particular MOU referenced by plaintiff, although KBS believes it to be one and the same. Defendant further objects to the relevance of this statement.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is undisputed, but irrelevant to the case at bar.

67.    A form question printed on said 1999 NWNB crime bond application asked specifically whether "…the bank (NWNB) received a Memo of Understanding…"

In support of this statement, McAninch cites to Ex. 2 of the D. Towle deposition. Defendant does not dispute this statement, but states that it had no knowledge of the contents of the MOU prior to disclosure during this litigation. Defendant also objects on the grounds of relevance.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is undisputed, but irrelevant to the case at bar.

68.    The question on said 1999 NWNB crime bond application was specifically answered "Yes" by NWNB.

In support of this statement, McAninch cites to Ex. 2 of the D. Towle deposition. Defendant does not dispute this statement, but states that it had no knowledge of the contents of the MOU prior to disclosure during this litigation. Defendant also objects on the grounds of relevance.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those

claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is undisputed, but irrelevant to the case at bar.

69. The following form printed instructions to NWNB were on said 1999 NWNB crime bond application: "If yes, please provide details in a separate letter to be attached to this form."

In support of this statement, McAninch cites to Ex. 2 of the D. Towle deposition. Defendant does not dispute this statement, but states that it had no knowledge of the contents of the MOU prior to disclosure during this litigation. Defendant also objects on the grounds of relevance.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is undisputed, but irrelevant to the case at bar.

70. Said 1999 NWNB crime bond application became a part of NWNB Crime Bond No. 3661AR issued to NWNB for the policy period October 7, 1999, to October 7, 2000. Said NWNB crime bond application in bold capitalized form print at the top says: "This application shall become a part of your bond."

In support of this statement, McAninch cites to Ex. 2 of the D. Towle deposition. Defendant does not dispute this statement, but states that it had no knowledge of the contents of the MOU prior to disclosure during this litigation. Defendant also objects on the grounds of relevance.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is undisputed, but irrelevant to the case at bar.

71. **The reason defendant KBS makes the "Annual Application and Renewal Form" for both defendant KBS's bank crime bonds and D&O liability policies a part of defendant KBS's bank crime bond and D&O liability policies is because defendant KBS is dependent on the information that was provided in the application to write the coverage.**

This statement is supported by the deposition testimony of Donald Towle and is not disputed by the parties. To the extent this statement applies to the crime bond issued to Sinclair National Bank, or any bond or policy issued to NWNB, I find it is irrelevant to the case at bar.

72. Defendant KBS attached and made part of the 1999 NWNB Crime Bond No. 3661AR and D&O Policy DL 9841AR the respective 1999 NWNB "Annual

33

Application and Renewal Forms" because KBS depended on the information that was provided in those applications to write the coverage.

In support of this statement, McAninch cites to Ex. 2 and 3 of the D. Towle deposition, as identified and authenticated by Donald Towle. Defendant does not dispute this statement, but objects on the grounds of relevance.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is undisputed, but irrelevant to the case at bar.

73.    **Defendant KBS attached and made part of the 2000 Sinclair National Bank (SNB or "the Bank") Crime Bond No. 4977AR and D&O Policy DL 1859AR the respective 2000 SNB "Annual Application and Renewal Forms" because KBS depended on the information that was provided in those applications to write the coverage.**

In support of this statement, McAninch cites to Ex. 2 of the D. Towle deposition. Defendant does not dispute this statement, but objects on the grounds of relevance as it relates to the bond.  I find that this fact is undisputed, but irrelevant to the case at bar as it relates to the bond.

74.     Any "separate letter" providing details of the December 14, 1998 MOU imposed by the OCC on the NWNB Board would have become a part of the KBS Financial Crime Bond No. 3661AR recommended, sold, renewed, and issued to NWNB for policy period October 7, 1999, to October 7, 2000.

In support of this statement, McAninch cites to Ex. 2 and 4 of the D. Towle deposition, deposition testimony of Donald Towle, and alleged admissions in Doc. No. 74. Defendant states that the evidence referenced does not support the above factual statement, that KBS did not recommend the bond as referenced, that there was no separate letter provided to KBS, and that KBS had no knowledge of the contents of the MOU prior to disclosure during this litigation. Defendant also objects on the grounds of relevance.

In his deposition testimony, Donald Towle stated that applications for insurance and bond coverage become part of the policies. In Document No. 74, KBS stated that it does not dispute that the application form for its policies and bond is part of its policies and bond. Defendant does not provide any additional evidence to dispute that fact. I therefore find that it is undisputed that information provided as part of NWNB's application for bond coverage would have become part of the bond.

The evidence plaintiff references does not support his characterization of defendant KBS's issuance of the crime bond to NWNB. Nothing in the evidence cited supports his contention that defendant recommended the bond issued. Exhibit 2 of the D. Towle deposition shows, instead, that NWNB intentionally

sought the particular bond issued. I therefore find that the above factual statement is disputed in part.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is disputed in part, and irrelevant to the case at bar.

75.    When said 1999 NWNB crime bond application was processed by defendant KBS, there was no follow-up about the disclosed MOU, the MOU's contents, or the lack of a "separate letter" providing details of the MOU.

This statement is supported by the deposition testimony of Donald Towle and is not disputed by the parties. Defendant objects on the grounds of relevance.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is undisputed, but irrelevant to the case at bar.

76.     Defendant KBS proceeded to issue KBS Financial Crime Bond 3661 AR to NWNB for the policy period October 7, 1999, to October 7, 2000, with said 1999 NWNB crime bond application attached as a part of the said crime bond policy.

In support of this statement, McAninch cites to Ex. 2 and 4 of the D. Towle deposition. Defendant does not dispute this statement, but states that it had no knowledge of the contents of the MOU prior to disclosure during this litigation. Defendant also objects on the grounds of relevance.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is undisputed, but irrelevant to the case at bar.

77.     The existence of the December 14, 1998 OCC MOU imposed on the NWNB Board was known by defendant KBS before defendant KBS issued KBS Financial Institution Crime Bond No. 3661AR and D&O Indemnity and Bank Lender Policy No. DL9841AR to NWNB for policy period October 7, 1999, to October 7, 2000.

In support of this statement, McAninch cites to Ex. 2 of the D. Towle deposition. Defendant controverts this statement in part, stating that it had no

knowledge of the contents of the MOU prior to disclosure during this litigation. Defendant also objects on the grounds of relevance.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is undisputed, but irrelevant to the case at bar.

78. Defendant KBS had notice of the existence of the December 14, 1998 OCC MOU imposed on the NWNB Board before defendant KBS issued KBS Financial Institution Crime Bond No. 3661AR and D&O Policy No. DL9841AR to NWNB for policy period October 7, 1999, to October 7, 2000.

In support of this statement, McAninch cites to the authority cited in paragraphs 66-76, above. KBS disputes this statement, stating that it is legal argument and should not be considered. Defendant also states that it had no knowledge of the contents of the MOU prior to disclosure during this litigation, and that there is no specific reference to the MOU as referenced as this particular MOU, although defendant states it believes they are one and the same.

I find that the above paragraph constitutes legal argument and is not supported by the authority referenced. Even if the above proffered statement were true, it would not tend to show that any of plaintiff's claims in this case are

meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is disputed legal argument, and irrelevant to the case at bar.

79.     Defendant KBS had knowledge of the existence of the December 14, 1998 OCC MOU imposed on the NWNB Board before defendant KBS issued KBS Financial Institution Crime Bond No. 3661AR and D&O Policy No. DL9841AR to NWNB for policy period October 7, 1999, to October 7, 2000.

In support of this statement, McAninch cites to the authority cited in paragraphs 66-76, above. KBS disputes this statement, stating that it had no knowledge of the contents of the MOU prior to disclosure during this litigation, and that there is no specific reference to the MOU as referenced as this particular MOU, although defendant states it believes they are one and the same.

Even if the above proffered statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is disputed in part, and irrelevant to the case at bar.

80.    The MOU was a claim, claims made, and/or loss under defendant KBS's bank insurance and crime bond policies defendant KBS recommended, sold, issued, and/or renewed to NWNB for the policy period October 7, 1999, to October 7, 2000, as extended by the Arkansas Endorsement.

In support of this statement, McAninch cites to KBS Ex. 1, and Ex. 1, 2, 3, 4, and 8 of the D. Towle deposition. KBS disputes this statement, stating that it is legal argument and should not be considered. Defendant also states that no claim was ever submitted to KBS under any policy of insurance or bond by NWNB. As noted above, Exhibit 1 of the D. Towle deposition is not properly authenticated.

I find that the above paragraph constitutes legal argument and is not supported by the authority referenced. Even if the above proffered statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is disputed legal argument, and irrelevant to the case at bar.

81.    NWNB filed KBS 1999 NWNB Annual Application and Renewal Forms for the defendant KBS bank insurance and crime bond policies defendant KBS recommended, sold, issued, and/or renewed to NWNB for policy period October 7, 1999, to October 7, 2000, as extended by the Arkansas Endorsement.

In support of this statement, McAninch cites to the authority cited in paragraphs 66-76, above. KBS objects to this statement on the grounds of relevance, and disputes that the policies were recommended.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. Plaintiff offers this fact in support of his argument that defendant KBS had notice and knowledge of potential claims against Damian Sinclair, that it insured over those claims, and that it waived or is estopped from asserting any defense of coverage of those claims. Even if the above fact were accepted as undisputed, as discussed below, McAninch still would have no claim. I therefore find that this fact is disputed in part, and irrelevant to the case at bar.

82.    NWNB submitted a KBS 1999 D&O insurance Annual Application and Renewal Form signed by Marc Wolin, Pres., to defendant KBS for defendant KBS D&O insurance coverage under Policy No. DL9841AR for policy period October 7, 1999, to October 7, 2000.

This statement is supported by Ex. 3 and 8 of the D. Towle deposition and is not disputed by the party. Defendant KBS objects on the grounds of relevance. Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is undisputed, but irrelevant to the case at bar.

83.    Said 1999 NWNB D&O insurance application contained a series of questions which asked NWNB to certify that (a) no cease and desist order has been received; (b) no claim which, if insurance had been in force similar to that

not applied for would have fallen within the scope of such insurance, has been made; (c) knowledge of acts, errors, or omissions which he has reason to suppose might affect valid grounds for any future claim such as would fall within the scope of the proposed insurance.

In support of this statement, McAninch cites Ex. 3 of the D. Towle deposition. Defendant KBS objects to this statement on the grounds of relevance. Defendant also states that, contrary to plaintiff's assertion, it did not admit this statement, and that the policy statement is not complete. Defendant has admitted to the exact language appearing in the application, not the abbreviated version offered by McAninch.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part, but irrelevant to the case at bar.

84. NWNB left each of said questions blank in said 1999 NWNB D&O application.

In support of this statement, McAninch cites to Ex. 3 of the D. Towle deposition. Defendant objects to this statement on the grounds of relevance and argues that the statement has not been properly authenticated. In the deposition, Donald Towle authenticated Ex. 3 as "an application renewal form for directors and officer, employee indemnity and bank lender liability policy." He testified that the document showed to him had a series of questions that the applicant is instructed to answer none, and that there was no answer there. Donald Towle did not authenticate Ex. 3, however, as the form completed by NWNB. Defendant is

therefore correct that the Ex. 3 has not been authenticated for the purpose of supporting the above factual statement.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed, and irrelevant to the case at bar.

85. Said 1999 NWNB D&O application instructed NWNB to answer "none" to each of said questions if there were none.

This statement relies on Ex. 3 of the D. Towle deposition, which has not been authenticated as the application submitted by NWNB. Defendant does not dispute the above statement, however, except to object on the grounds of authentication and relevance. Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is undisputed, but unauthenticated and irrelevant to the case at bar.

86. Defendant KBS made no follow-up demanding NWNB answer the aforesaid questions. Nor did defendant KBS do so when Sinclair National Bank left these identical questions blank.

In support of this statement, McAninch cites to Ex. 3 of the D. Towle deposition, and lines 1-6 of page 48 of that deposition. This authority does not support the above factual statement. Immediately following the deposition testimony cited, however, Donald Towle testified that he did not follow up on the lack of any answer to the application questions. Mr. Towle further testified that if the bank lied on the application, the "plastic paragraphs take care of it." The last

paragraphs on the application exclude from coverage any claim or action emanating from any fact, circumstance, or situation then known to any director, officer, or employee of the bank. Mr. Towle subsequently testified that if the bank fails to answer the questions, KBS assumes the answer is none and they "catch it by that last statement." McAninch also cites to Document No. 74, defendant's reply to plaintiff's opposition to its initial motion for summary judgment. Defendant states that, contrary to plaintiff's assertion, it did not admit the above statement, as Document No. 74 referenced the bond application and not the D&O policy.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed, and irrelevant to the case at bar.

87.     The three said questions were designed, among other things, to determine the existence or non-existence of MOUs in the NWNB D&O application process.

In support of this statement, McAninch cites to the deposition testimony of Donald Towle, in which Mr. Towle stated as follows:

> Q:     Now, why did you have those three questions?
> A:     Well, because if the bank was truthful, they'd have told us they had an MOU or they'd had a lawsuit or whatever else we'd asked for there.

Defendant states that the deposition testimony does not support the proffered statement. The above question and answer is given in the context of plaintiff's questioning regarding KBS's failure to follow up on the absence of answers to the questions. Nonetheless, the testimony does indirectly support the above factual statement.

Defendant also objects on the grounds of relevance. Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is undisputed, but irrelevant to the case at bar.

88.     Defendant KBS intentionally did not follow up on the said three questions that NWNB left blank on said 1999 NWNB D&O application.

In support of this statement, McAninch cites to Ex. 3 of the D. Towle deposition, as well as page 48, lines 1-7, and page 49, lines 5-20 of Donald Towle's deposition. Defendant objects to the statement as legal argument and on the grounds of relevance. From the deposition testimony, it is clear that KBS's failure to follow up on the lack of answers on the application did not arise from negligence, but was the result of a conscious decision or policy of KBS officers. Defendant does not offer any evidence to rebut this conclusion.

Even if the above factual statement were true, however, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is undisputed, but irrelevant to the case at bar.

89.     Defendant KBS recommended, sold, issued, and/or renewed Financial Institution Crime Bond No. 3661AR and D&O Policy No. DL9841AR to NWNB for a policy period of October 7, 1999 to October 7, 2000.

In support of this statement, McAninch cites to Ex. 4 of the D. Towle deposition, as authenticated in the deposition testimony of Donald Towle. Plaintiff also asserts that defendant admitted the above fact in Document No. 74. Defendant does not dispute that it issued the bond and policies to NWNB as new

policies in the year referenced. Defendant states, however, that it did not recommend the bond and policy. The evidence cited by plaintiff does not support his contention that defendant recommended the policies and bond.

Defendant also objects to the above factual statement on the grounds of relevance. Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part, and irrelevant to the case at bar.

90. Ex. 4 D. Towle Deposition is a binder cover sheet to which KBS Crime Bond No. 3661AR and its 1999 NWNB crime bond application and KBS D&O Policy No. DL9841AR and its 1999 NWNB D&O insurance application and another KBS policy were stapled together and forwarded to NWNB.

Defendant disputes this statement in part, citing to the deposition of Charles Towle, in which the exhibit is identified as a table of contents to the bonds and policies sent to NWNB. Defendant does not dispute that it issued the bond and policies to NWNB as new policies in the year referenced, but objects on the grounds of relevance. The distinction over whether the exhibit is a binder cover sheet or a table of contents is trivial, although both descriptions are supported by the evidence.

Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part, but immaterial and irrelevant to the case at bar.

91.     The said 1999 NWNB crime bond application became a part of said KBS Crime Bond No. 3661AR recommended, sold, issued, and/or renewed to NWNB for policy period October 7, 1999, to October 7, 2000.

In support of this statement, McAninch cites to authority cited in previous paragraphs. Defendant does not dispute that it issued a new bond to NWNB and that the application became a part of the bond. Defendant states that the authority cited does not support the above factual statement and objects on the grounds of authentication and relevance.

The exhibits cited by plaintiff are not authenticated as the applications of NWNB, and so do not fully support the above statement. Nothing in any of the evidence cited by plaintiff supports his assertion that defendant recommended the crime bond to NWNB. Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part, unauthenticated, and irrelevant to the case at bar.

92.     The said 1999 NWNB D&O insurance application became a part of KBS D&O Policy No. DL9841AR recommended, sold, issued, and/or renewed to NWNB for policy period October 7, 1999, to October 7, 2000.

In support of this statement, McAninch cites to authority cited in previous paragraphs. Defendant does not dispute that it issued a new bond to NWNB and that the application became a part of the bond. Defendant states that the authority cited does not support the above factual statement and objects on the grounds of authentication and relevance.

The exhibits cited by plaintiff are not authenticated as the applications of NWNB, and so do not fully support the above statement. Nothing in any of the evidence cited by plaintiff supports his assertion that defendant recommended the crime bond to NWNB. Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part, unauthenticated, and irrelevant to the case at bar.

93. Defendant KBS knew of the existence and contents of the December 14, 1998 OCC MOU before defendant KBS issued Ex. 4 D. Towle Deposition and attached KBS Crime Bond No. 3661AR and D&O Policy No. DL9841AR to NWNB.

In support of this statement, McAninch cites to authority cited in previous paragraphs. Defendant denies any knowledge of the contents of the MOU prior to its disclosure during this litigation, stating that there is no specific reference to the MOU as references as that MOU in any document provided to KBS. Defendant states that the authority cited does not support the above factual statement and objects on the grounds of relevance.

Nothing in any of the evidence cited by plaintiff supports his assertion that defendant knew of the contents of the MOU before issuing the D&O policy to NWNB. Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

94.     Defendant KBS should have known of the existence and contents of the December 14, 1998 OCC MOU before defendant KBS issued Ex. 4 D. Towle deposition and attached KBS Crime Bond No. 3661AR and D&O Policy No. DL9841AR to NWNB.

In support of this statement, McAninch cites to authority cited in previous paragraphs. Defendant responds that this statement contains legal argument that should not be considered, denies any knowledge of the contents of the MOU prior to its disclosure in the course of this litigation, and objects on the grounds of relevance. None of the authority cited by McAninch supports his statement that KBS, as a factual matter, should have known of the contents of the MOU. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed, improper legal argument, and irrelevant to the case at bar.

95.     Defendant KBS knew of the existence of the OCC MOU throughout the policy period October 7, 1999, to October 7, 2000.

In support of this statement, McAninch cites to authority cited in previous paragraphs. Defendant objects on the grounds of relevance and authentication. Citing the affidavits of Charles M. Towle, defendant states that it had no knowledge of the contents of the MOU prior to its disclosure during the course of this litigation and no knowledge of any communications NWNB had with its regulators at any time.

Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

96.     Defendant KBS should have known of the existence of the OCC MOU throughout the policy period October 7, 1999, to October 7, 2000.

In support of this statement, McAninch cites to authority cited in previous paragraphs. Defendant responds that this statement contains improper legal argument which should not be considered. Defendant denies any knowledge of the contents of the MOU prior to its disclosure during this litigation. Defendant further objects on the grounds of relevance.

Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is improper legal argument and irrelevant to the case at bar.

97.     Defendant KBS did not follow up on the information about the MOU in said 1999 NWNB Crime Bond application at any time during policy period October 7, 1999, to October 7, 2000.

In support of this statement, McAninch cites to authority referenced in previous paragraphs. Defendant objects on the grounds of relevance and states that the authority cited does not support this statement. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

98.     Defendant KBS did not investigate the information about the MOU in said 1999 NWNB D&O application at any time during the policy period October 7, 1999, to October 7, 2000.

In support of this statement, McAninch cites to authority referenced in previous paragraphs. Defendant objects on the grounds of relevance and states that the authority cited does not support this statement. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

99.     Defendant KBS insured over the MOU when it recommended, sold, issued, and/or renewed KBS Crime Bond No. 3661AR to NWNB.

In support of this statement, plaintiff McAninch cites to authority referenced in previous paragraphs. Defendant objects to this statement as legal argument and on the grounds of relevance, and states that the cited authority does not support the above statement. Nothing in the evidence referenced by plaintiff supports his assertion that KBS insured over the MOU, or that it recommended a particular bond or policy to NWNB. As discussed above, the evidence cited by McAninch, in fact, supports the opposite conclusion: that NWNB specifically requested the particular bond and policies it wished to purchase, and that KBS specifically excluded coverage for any claims arising from the MOU or any facts or circumstances then known to the applicants. In any event, coverage under the above bond is not at issue in this lawsuit. Even if the above statement were true, it

would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

100.    Defendant KBS insured over the MOU when it recommended, sold, issued, and/or renewed KBS D&O Policy No. DL9841AR to NWNB.

In support of this statement, plaintiff McAninch cites to authority referenced in previous paragraphs. Defendant objects to this statement as legal argument and on the grounds of relevance, and states that the cited authority does not support the above statement. Nothing in the evidence referenced by plaintiff supports his assertion that KBS insured over the MOU, or that it recommended a particular bond or policy to NWNB. As discussed above, the evidence cited by McAninch, in fact, supports the opposite conclusion: that NWNB specifically requested the particular bond and policies it wished to purchase, and that KBS specifically excluded coverage for any claims arising from the MOU or any facts or circumstances then known to the applicants. In any event, coverage under the above D&O policy is not at issue in this lawsuit. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

101.    Damian Sinclair bought NWNB on March 2, 2000.

The above statement is partially supported by Ex. 5 of the D. Towle deposition, a letter that is not authenticated but which is not specifically disputed by defendants, informing "To Whom It May Concern" of a change in ownership of NWNB effective March 2, 2000. Damian Sinclair and co-plaintiff Susan W.

Sinclair are listed as two of five new Board members. Defendant denies that it was provided with or had any knowledge of the details of the sale of NWNB to Damian Sinclair and Susan Sinclair prior to the disclosure of documents during this litigation. Defendant does not dispute that it received correspondence referencing a change in ownership of NWNB as of March 2, 2000. I find the above fact disputed in part and based on unauthenticated documentation. I note, however, that the relevant background of the change in ownership of the Bank has been related in the undisputed facts submitted by other parties to this lawsuit.

102.    In 1999 Damian Sinclair and SNB filed a change of ownership application with the OCC which contained a written business plan.

In support of this statement, McAninch cites to Ex. 23 of the deposition of Charles M. Towle, and states that defendant admitted this fact in Document No. 74. At paragraph 18 of Document No. 74, defendant responds to a statement similar to the one above as "Uncontroverted although not properly authenticated." A notable difference, however, is the addition of Damian Sinclair's name. This statement is not supported by any testimony of record, and Ex. 23 has not been authenticated. Moreover, even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

103.    SNB's business plan was heavily reliant on sub-prime lending and purchase of bulk commercial paper from Stevens Financial Group.

104.    Defendant KBS would if it saw a bank which was applying for KBS crime bond and D&O liability coverage that had significant sub-prime lending investigate that bank further.

105.    SNB's business plan submitted with SNB's change of ownership application showed significant sub-prime lending.

This statement is supported by the unauthenticated Ex. 23. Defendant does not dispute that the documents state as above. Defendant disputes, however, that these facts were known to KBS. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is undisputed but irrelevant to the case at bar.

106.    Defendant KBS never investigated SNB's business plan.

In support of this statement, McAninch cites to the deposition testimony of Charles M. Towle, and states that KBS admitted the above statement in Document No. 74. Defendant disputes this statement, stating that facts relating to the Business Plan were not known to KBS.

I find that the authority cited by McAninch does not support the above statement. Mr. Towle did not testify that KBS never investigated SNB's business plan in the section cited by plaintiff. KBS did not admit this statement in Paragraph 19 of Document No. 74. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

107.    Defendant KBS could have but did not investigate SNB's business plan or the SNB purchasers of NWNB through the Federal Deposit Insurance Corporation

(FDIC) or OCC and defendant KBS could have done so before the change of ownership on March 2, 2000.

In support of this statement, McAninch cites to the deposition testimony of Donald Towle. At page 17 and 18 of the D. Towle deposition, Mr. Towle testified as follows:

> Q: Did there come a time when you learned that Sinclair National Bank had bought Northwest National Bank?
> …
> A: There was a time when we got a notice of change of ownership.
> Q: And did you object to that change of ownership?
> A: No.
> Q: And what investigation did you make into Mr. Sinclair and those who were purchasing Northwest National Bank?
> A: None.
> Q: Did you look at the FDIC filing?
> A: No.
> Q: Did you look at the OCC filings?
> A: No.
> Q: Why not?
> A: Well, we had no reason to.
> Q: Well, didn't you want to know what Mr. Sinclair's banking background was?
> A: There wasn't a new charter then, it was a going bank.
> Q: And what difference did that make to you?
> A: It was a going bank that we insured. It didn't make any difference to me. We insured change of ownership banks constantly.
> Q: And you don't investigate whenever there's a change of ownership in banks?
> A: No.

Defendant responds that the above statement contains legal argument which should not be considered. It disputes that facts relating to the business plan were known to KBS.

I find that the above testimony does not support McAninch's assertion that KBS "could have but did not investigate" SNB's business plan or the SNB purchasers before the change in ownership on March 2, 2000. Even if the above

statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

108.    Defendant KBS insured over SNB's business plan which was heavily reliant on sub-prime lending and purchase of bulk commercial paper from Stevens Financial Group without investigation.

In support of this statement, McAninch cites to authority referenced in previous paragraphs. Defendant KBS objects that the above statement contains legal argument that should not be considered. Nothing in the evidence cited by plaintiff supports his assertion that defendant insured over the Bank's business plan. The evidence of record, in fact, supports the opposite conclusion: that KBS specifically excluded any claims arising from information known to the applicants and not disclosed. Moreover, even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed, improper legal argument, and irrelevant to the case at bar.

109.    NWNB changed its name to SNB.

In support of this statement, McAninch cites to Ex. 9 of the D. Towle deposition, a document purporting to be Crime Bond. No. 4977AR, issued to Sinclair National Bank, Gravette, AR. Defendant does not dispute that after the change in ownership, the Bank changed its name to SNB. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this

case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

110.    Damian Sinclair was the sole stockholder of SNB until Damian Sinclair gave 5% of the stock to plaintiff Susan Sinclair Wintermute.

In support of this statement, McAninch cites to the affidavit of Susan Wintermute and the findings of this court in its order on the parties' first motions for summary judgment. Defendant does not dispute that Damian Sinclair and Susan Sinclair were the principle shareholders of SNB. In her affidavit in support of her initial motion for summary judgment, Wintermute stated that "I was never a majority owner of Sinclair National Bank (the "Bank"). My former husband, Damian Sinclair, purchased 100% of the shares of Northwest National Bank, and then re-named the bank Sinclair National Bank. He then transferred 5% of the Bank's stock to me. I never owned more than that amount." This statement does not support plaintiff's assertion that he was the sole shareholder until he transferred 5% of the stock to Susan Wintermute, although there is no evidence of any other shareholder of the bank. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

111.    **At all times material herein, Damian Sinclair was a director of SNB.**

This statement is supported by abundant evidence of record, including the pleadings in this case, and is not disputed by the parties.

112.    At all times material herein, Damian Sinclair was an officer of SNB.

In support of this statement, McAninch cites to the authority referenced in previous paragraphs. No evidence in the record supports plaintiff's assertion that Damian Sinclair was an officer of SNB. I therefore find that this fact is disputed. Because coverage under the D&O policy is the same for officers as it is for directors, I find this dispute of fact to be immaterial.

113.  At all times material herein, Damian Sinclair was an employee of SNB.

In support of this statement, McAninch cites to the authority referenced in previous paragraphs. No evidence in the record supports plaintiff's assertion that Damian Sinclair was an employee of SNB. I therefore find that this fact is disputed. Because coverage under the D&O policy is the same for employees as it is for directors, I find this dispute of fact to be immaterial.

114.  **Defendant KBS received a letter and possibly a phone call notifying defendant KBS of the change in ownership on or about March 3, 2000**.

This statement is supported in part by the unauthenticated Ex. 5 of the D. Towle deposition. The statement is not disputed by the parties.

115.  Defendant KBS insured SNB and SNB's directors, officers, and employees under NWNB Crime Bond No. 3661AR and NWNB D&O Policy DL9841AR from the change of ownership on March 2, 2000, until October 7, 2000.

In support of this statement, McAninch cites to Ex. 5 and Ex. 8 and states that KBS admitted to this fact in Document No. 74. Defendant does not dispute that Damian Sinclair and Susan Sinclair were listed as insured directors upon sale of NWNB on D&O Policy No. DL9841AR, and this fact is supported by the

above-referenced evidence. Defendant states that the bond does not insure directors, officers, and employees of any bank. None of the evidence cited by plaintiff supports his assertion that Crime Bond No. 3661AR insured SNB's directors, officers, and employees at any time. I therefore find this fact to be disputed in part.

116. **After defendant KBS received Ex. 5 D. Towle Deposition, defendant KBS made no inquiry or investigation of SNB or SNB's officers, directors, employees, or intended business.**

This statement is supported by the deposition testimony of Charles Towle and is not disputed by the parties.

117. **There was no gap in KBS crime bond or D&O liability coverage as a result of NWNB's selling the bank to Damian Sinclair and SNB.**

In support of this statement, McAninch cites to the findings of this court in its previous order on the parties' first motions for summary judgment. Paragraph 6 of the findings of fact in that order is identical to paragraph 6 in the instant order. It does not support the above statement. Plaintiff also cites to pages 68 and 69 of Volume II of the 30(b)(6) deposition of Charles M. Towle. Volume II of that deposition transcript has only 42 pages. The testimony reflected on pages 68 and 69 of Volume I of that deposition transcript, however, support plaintiff's assertion. Defendant does not dispute that the bonds and policies remained in effect after the change in ownership. Defendant objects on the grounds of relevance of the bond.

As the above statement pertains to the bond, even if it were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is undisputed. As it relates to the bond, however, the statement is irrelevant to the case at bar.

118.     The purchase of NWNB by Damian Sinclair was a stock purchase.

In support of this statement, McAninch cites to the affidavit of Susan Wintermute in support of her first motion for summary judgment. In that affidavit, Ms. Wintermute states that Damian Sinclair purchased the stock of NWNB and then transferred 5% to her. Defendant denies any knowledge of the details of the sale of NWNB to Damian and Susan Sinclair prior to the disclosure of documents during this litigation. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is only partially supported by the citation to the record and irrelevant to the case at bar.

119.     SNB became the owner of all assets of NWNB.

In support of this statement, McAninch cites to the affidavit of Susan Wintermute in support of her first motion for summary judgment. In that affidavit, Ms. Wintermute states that Damian Sinclair purchased the stock of NWNB and then transferred 5% to her. Defendant denies any knowledge of the details of the sale of NWNB to Damian and Susan Sinclair prior to the disclosure of documents during this litigation. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I

therefore find that this fact is only partially supported by the citation to the record and irrelevant to the case at bar.

120. **Defendant KBS did not object to the change in ownership of NWNB to SNB.**

This statement is supported by the deposition testimony of Donald Towle and is not disputed by the parties.

121. Defendant KBS did not object to Damian Sinclair as director, officer, or employee of SNB.

In support of this statement, defendant cites to authority referenced in previous paragraphs, including defendant KBS's reply brief on its first motion for summary judgment (Document No. 74), the affidavit of Susan Wintermute, and Ex. 8 of the Charles M. Towle deposition. These documents do not show any objection made by KBS, however, defendant disputes that is had any communication with SNB after receiving notice that Damian Sinclair was a new director. Defendant further disputes that Damian Sinclair was ever identified as an officer or employee to KBS.

Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

122. **On or about August 23, 2000, SNB filed with KBS applications for KBS crime bond and D&O liability coverage in SNB's own name.**

This statement is supported by the policies in the record and is not disputed by the parties. Defendant objects on the grounds of relevance as this

statement relates to the crime bond. I find that this fact is undisputed, but irrelevant as it relates to the crime bond.

123.    As a condition of the sale of NWNB to Damian Sinclair and SNB, the OCC imposed the December 14, 1998 MOU on the Board of SNB.

In support of this statement, McAninch cites to Document No. 74, defendant's reply to McAninch's suggestions in opposition to KBS's first motion for summary judgment. At paragraph 21 of plaintiff's statement of facts, he proffered a similar factual statement, citing various unauthenticated exhibits in support of this statement. In Document No. 74, KBS did not dispute that the MOU remained in effect after the change in ownership of the Bank. KBS denied any knowledge of the contents of the MOU. In Document 74, defendant objected to plaintiff's failure to properly authenticate the exhibits cited. Defendant maintains its objection to the authentication of the above statement. I find that the above statement has not been properly authenticated. Moreover, even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find that the above factual statement is disputed in part and irrelevant to the case at bar.

124.    By the December 14, 1998 MOU's terms, the MOU imposed duties on the Board of SNB which the Board owed to SNB.

In support of this statement, McAninch asserts that defendant admitted to this fact in Document No. 74. Defendant objects that plaintiff has misstated his statement at paragraph 6 of his brief and defendant's response to that paragraph. Defendant did not dispute that, by its terms, the MOU imposed duties on the

board of NWNB. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find that the above factual statement is disputed and irrelevant to the case at bar.

125.    The December 14, 1998 MOU was binding on Damian Sinclair and the other members of the SNB Board.

In support of this statement, McAninch cites to the unauthenticated Ex. 1 of the D. Towle deposition and authority referenced in previous paragraphs. Defendant responds that there is no exhibit or testimony to authenticate this statement and that KBS has no knowledge of any communications between the OCC and Damian Sinclair or SNB. Nothing in the authority cited by plaintiff supports the above factual statement. even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find that the above factual statement is disputed and irrelevant to the case at bar.

126.    **The 2000 KBS crime bond and D&O liability insurance applications submitted by the Bank to defendant KBS for the policy period October 7, 2000, to October 7, 2001, were defendant KBS forms.**

Defendant does not dispute that the application forms sent to the bank were KBS forms, and this fact is supported by the evidence of record. As this statement relates to the crime bond, defendant disputes its relevance. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find that the above factual statement is undisputed but, as it relates to the crime bond, irrelevant to the case at bar.

127.    The 2000 KBS crime bond and D&O liability insurance applications submitted by SNB to defendant KBS for policy period October 7, 2000, to October 7, 2001, were defendant KBS forms drafted by President Donald M. Towle and Senior Vice-President Charles M. Towle of defendant KBS with the help of their lawyers.

In support of this statement, defendant cites to the deposition testimony of Donald Towle and Charles Towle. This statement misrepresents the testimony of defendant's officers, who stated that the policies were drafted by external organizations and modified by defendant's officers with the assistance of counsel. Defendant also objects to the relevance of this statement as it relates to the bond. I therefore find this statement disputed and irrelevant as it relates to the bond.

128.    The 1999 KBS crime bond and D&O liability insurance applications form language submitted by NWNB to defendant KBS for policy period October 7, 1999 to October 7, 2000, was identical to the 2000 crime bond and D&O liability insurance applications form language submitted by SNB to KBS for the policy period October 7, 2000 to October 7, 2001.

In support of this statement, McAninch cites to authority referenced in previous paragraphs. The deposition testimony and admissions cited relate to who drafted the applications, not the language used on the respective forms. Defendant disputes this statement in part, stating that the bond forms contain variations as reflected on the face of the bonds. Defendant objects to this statement on the grounds of relevance.

Whether the application forms were identical or substantially similar is not a material issue of fact in this litigation. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find that the above factual statement is disputed in part and irrelevant to the case at bar.

129. The existence of the MOU was disclosed to defendant KBS in the 2000 SNB Annual Application and Renewal Form signed by Richard Wilson, Acting CEO of SNB, on August 23, 2000, for defendant KBS under Crime Bond No. 4977AR for policy period October 7, 2000 to October 7, 2001.

In support of this statement, defendant cites to Ex. 10 of the D. Towle deposition. Exhibit 10 purports to be a premium statement from KBS to Sinclair National Bank. This exhibit does not support the above statement. Exhibit 9, however, is a copy of Financial Institution Crime Bond No. 4977AR, with an application attached signed by "Richard Wilson, Acting CEO." This document has not been properly authenticated, although defendant has not objected to its authenticity. Assuming the document is authentic, in response to the question "Has the bank received a Memo of Understanding or Cease and Desist Order from any supervisory authority within the last five years," there is a handwritten response of "Yes." This response did constitute disclosure that either an MOU or a Cease and Desist Order had been sent to the bank from some supervisory authority. Defendant denies any knowledge of the contents of the MOU prior to disclosure during this litigation, and plaintiff has offered no evidence to suggest

that the particular MOU or its contents were disclosed to KBS during the application for bond.

Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. No claims involving the crime bond are at issue in this case, and even if the "yes" response constitutes disclosure of the MOU, it does not support McAninch's arguments that KBS waived any objection to coverage under the D&O policy, or that they insured over the particular claims asserted. I therefore find that the above factual statement is irrelevant to the case at bar.

130.    A form question printed on said 2000 SNB crime bond application asked specifically whether "the bank (SNB) received a Memo of Understanding."

For the reasons discussed above, I find that the above factual statement is irrelevant to the case at bar.

131.    The question on said 2000 SNB crime bond application was specifically answered "yes" by NWNB.

For the reasons discussed above, I find that the above factual statement is irrelevant to the case at bar.

132.    The following form printed instructions to SNB were on said 2000 SNB crime bond application: "If yes, please provide details in a separate letter to be attached to this form."

For the reasons discussed above, I find that the above factual statement is irrelevant to the case at bar.

133.    Said "separate letter" proving details was to be attached to "this form"—the 2000 SNB crime bond application.

For the reasons discussed above, I find that the above factual statement is irrelevant to the case at bar.

134.    Defendant KBS did not demand that SNB provide a written letter of explanation of the details of the MOU referenced in the Annual Application and Renewal Form submitted by SNB to defendant KBS on or about August 23, 2000 for KBS Crime Bond No. 4977AR.

For the reasons discussed above, I find that the above factual statement is irrelevant to the case at bar.

135.    Said 2000 SNB crime bond application became a part of SNB's Crime Bond No. 4977AR for policy period October 7, 2000 to October 7, 2001. Said crime bond application in bold capitalized form at the top says: "This application shall become a part of your bond."

For the reasons discussed above, I find that the above factual statement is irrelevant to the case at bar.

136.    **Said 2000 SNB D&O application contained a series of questions which asked NWNB to certify that (a) no cease and desist order has been received; (b) no claim which, if insurance had been in force similar to that now applied for would have fallen within the scope of such insurance, has been made; (c) knowledge of acts, errors, or omissions which he has reason to suppose might affect valid grounds for any future claim such as would fall within the scope of the proposed insurance.**

In support of this statement, McAninch cites to the unauthenticated Ex. 1 of the D. Towle deposition, and the deposition testimony of Donald Towle. The evidence cited does not support the above statement. Defendant denies that the D&O application contained any information regarding NWNB. The above factual statement is most likely a typographical error and should state that the applications asked SNB to certify those matters. Defendant has repeatedly indicated that it does not dispute the language that appears on the face of the D&O policy itself. The above factual statement does reflect a reasonable summary of questions asked on the D&O policy application. I therefore find that the above factual statement is supported by the language of the D&O policy and is not disputed by the parties, with the correction that the application requested information from SNB, and not from NWNB.

137. **SNB left each of said questions blank in said 2000 SNB D&O application.**

This fact is supported by the D&O policy and is not disputed by the parties.

138. **Said 2000 SNB D&O application instructed SNB to answer "None" to each of said questions if there were none.**

This factual statement is supported by the D&O policy and is not disputed by the parties.

139. KBS made no follow-up demanding SNB answer the aforesaid questions. KBS has produced the D&O Policy No. DL9841AR which has said SNB D&O application attached.

68

In support of this statement, McAninch cites to KBS's reply brief in Document No. 74, in which KBS stated that it did not dispute that it did not demand that SNB provide a written letter of explanation in connection to the bond application. This statement does not support the above factual assertion. KBS states that Charles Towle testified that if the bank is truthful they answer the question and if they fail to answer it, KBS assumed the answer is "none," and the last paragraph on the application covers the response if the bank is untruthful.

Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find that the above factual statement is disputed and irrelevant to the case at bar.

140. **The three said questions were designed among other things to determine the existence or non-existence of MOU's in the SNB D&O application process.**

In support of this statement, McAninch cites to the deposition testimony of Donald Towle. Defendant states that the deposition testimony does not support the proffered statement. The above question and answer is given in the context of plaintiff's questioning regarding KBS's failure to follow up on the absence of answers to the questions. Nonetheless, the testimony does indirectly support the above factual statement. I therefore find the above factual statement is undisputed.

141. **Defendant KBS intentionally did not follow up on the said three questions that SNB left blank on said 2000 SNB D&O application.**

In support of this statement, McAninch cites to Ex. 3 of the D. Towle deposition, as well as page 48, lines 1-7, and page 49, lines 5-20 of Donald

Towle's deposition. Defendant objects to the statement as legal argument and on the grounds of relevance. From the deposition testimony, it is clear that KBS's failure to follow up on the lack of answers on the application did not arise from negligence, but was the result of a conscious decision or policy of KBS officers. Defendant does not offer any evidence to rebut this conclusion. I therefore find the above statement is undisputed.

142. Defendant KBS recommended, sold, issued, and/or renewed Financial Institution Crime Bond No. 4977AR and D&O Liability Policy No. DL1859AR to SNB for a policy period of October 7, 2000 to October 7, 2001.

Defendant does not dispute that it issued the bond and policies to NWNB as new policies in the year referenced. Defendant states, however, that it did not recommend the bond and policy. KBS Ex. 1 and Exhibits 7, 9, and 10 of the D. Towle deposition cited by plaintiff does not support his contention that defendant recommended the policies and bond.

Defendant also objects to the above factual statement on the grounds of relevance. Even if the above factual statement were true, as it relates to the crime bond, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part, and, as it relates to the crime bond, irrelevant to the case at bar.

143. The said 2000 SNB crime bond application became a part of said KBS Crime Bond No. 4977AR recommended, sold, issued, and/or renewed to SNB for policy period October 7, 2000 to October 7, 2001.

For the reasons stated above, I find that this statement is disputed in part and irrelevant to the case at bar.

144.    The said 2000 SNB D&O application became a part of KBS D&O Policy No. DL1859AR recommended, sold, issued, and/or renewed to SNB for policy period October 7, 2000 to October 7, 2001.

Defendant does not dispute that it issued a new policy to SNB and the application became part of the policy. Defendant denies that it recommended the policy as referenced and objects on the grounds of relevance. Defendant does not expound on its argument that the above factual statement is irrelevant to the case at bar, which concerns claims brought pursuant to D&O Policy No. DL1859AR. Plaintiff McAninch cites no evidence supporting his assertion that KBS recommended the D&O policy to SNB. I find that, for the reasons discussed above, no genuine dispute of fact exists as to the above factual statement. **The policy was issued, but not recommended, and the application became part of the policy.**

145.    Defendant KBS knew of the existence and contents of the December 14, 1998 OCC MOU before defendant KBS issued KBS Crime Bond No. 4977AR and D&O Policy No. 1859AR to SNB.

In support of this statement, McAninch cites to authority cited in previous paragraphs. Defendant denies any knowledge of the contents of the MOU prior to its disclosure during this litigation, stating that there is no specific reference to the MOU as references as that MOU in any document provided to KBS. Defendant

states that the authority cited does not support the above factual statement and objects on the grounds of relevance.

Nothing in any of the evidence cited by plaintiff supports his assertion that defendant knew of the contents of the MOU before issuing the D&O policy to NWNB. Even if the above factual statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

146.    Defendant KBS should have known of the existence and contents of the December 14, 1998 OCC MOU before defendant KBS issued KBS Crime Bond No. 4977AR and D&O Policy No. 1859AR to SNB.

In support of this statement, McAninch cites to authority cited in previous paragraphs. Defendant responds that this statement contains legal argument that should not be considered, denies any knowledge of the contents of the MOU prior to its disclosure in the course of this litigation, and objects on the grounds of relevance. None of the authority cited by McAninch supports his statement that KBS, as a factual matter, should have known of the contents of the MOU. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed, improper legal argument, and irrelevant to the case at bar.

147.    Defendant KBS knew of the existence of the OCC MOU throughout the policy period October 7, 2000 to October 7, 2001.

In support of this statement, McAninch cites to authority cited in previous paragraphs. Defendant objects on the grounds of relevance and authentication.

Citing the affidavits of Charles M. Towle, defendant states that it had no knowledge of the contents of the MOU prior to its disclosure during the course of this litigation and no knowledge of any communications NWNB had with its regulators at any time.

Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

148.    Defendant KBS should have known of the existence of the OCC MOU throughout the policy period October 7, 2000 to October 7, 2001.

In support of this statement, McAninch cites to authority cited in previous paragraphs. Defendant responds that this statement contains improper legal argument which should not be considered. Defendant denies any knowledge of the contents of the MOU prior to its disclosure during this litigation. Defendant further objects on the grounds of relevance.

Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is improper legal argument and irrelevant to the case at bar.

149.    Defendant KBS did not follow up on the information about the MOU in said SNB crime bond application at any time during the policy period October 7, 2000 to October 7, 2001.

In support of this statement, McAninch cites to authority referenced in previous paragraphs. Defendant objects on the grounds of relevance and states that the authority cited does not support this statement. Even if the above

statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

150.    Defendant KBS did not investigate the information about the MOU in said SNB crime bond application at any time during the policy period October 7, 2000 to October 7, 2001.

In support of this statement, McAninch cites to authority referenced in previous paragraphs. Defendant objects on the grounds of relevance and states that the authority cited does not support this statement. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

151.    Defendant KBS did not follow up on the information about the MOU in said SNB D&O application at any time during the policy period October 7, 2000 to October 7, 2001.

In support of this statement, McAninch cites to authority referenced in previous paragraphs. Defendant objects on the grounds of relevance and states that the authority cited does not support this statement. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

152. Defendant KBS did not investigate the information about the MOU in said SNB D&O application at any time during the policy period October 7, 2000 to October 7, 2001.

In support of this statement, McAninch cites to authority referenced in previous paragraphs. Defendant objects on the grounds of relevance and states that the authority cited does not support this statement. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

153. Defendant KBS insured over the MOU with it recommended, sold, issued, and/or renewed KBS Crime Bond No. 4977AR to SNB.

In support of this statement, plaintiff McAninch cites to authority referenced in previous paragraphs. Defendant objects to this statement as legal argument and on the grounds of relevance, and states that the cited authority does not support the above statement. Nothing in the evidence referenced by plaintiff supports his assertion that KBS insured over the MOU, or that it recommended a particular bond or policy to SNB. The evidence cited by McAninch, in fact, supports the opposite conclusion: that SNB specifically requested the particular bond and policies it wished to purchase, and that KBS specifically excluded coverage for any claims arising from the MOU or any facts or circumstances then known to the applicants. In any event, coverage under the above bond is not at issue in this lawsuit. Even if the above statement were true, it would not tend to

show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

154. Defendant KBS insured over the MOU when it recommended, sold, issued, and/or renewed KBS D&O Policy No. 1859AR to SNB.

In support of this statement, plaintiff McAninch cites to authority referenced in previous paragraphs. Defendant objects to this statement as legal argument and on the grounds of relevance, and states that the cited authority does not support the above statement. Nothing in the evidence referenced by plaintiff supports his assertion that KBS insured over the MOU, or that it recommended a particular bond or policy to SNB. The evidence cited by McAninch, in fact, supports the opposite conclusion: that SNB specifically requested the particular bond and policies it wished to purchase, and that KBS specifically excluded coverage for any claims arising from the MOU or any facts or circumstances then known to the applicants. In any event, coverage under the above bond is not at issue in this lawsuit. Even if the above statement were true, it would not tend to show that any of plaintiff's claims in this case are meritorious. I therefore find that this fact is disputed in part and irrelevant to the case at bar.

155. **On September 26, 2000, KBS forwarded to SNB, Attention: Richard Wilson, President, KBS Crime Bond No. 4977AR and D&O Policy No. DL1859AR for policy period October 7, 2000 to October 7, 2001, by letter of September 26, 2000, on defendant KBS letterhead signed by Lynn Crouse, Asst. Corporate Secretary of KBS.**

In support of this statement, defendant cites to the September 26 letter, as well as another exhibit purporting to be a revised premium statement from KBS, and the alleged admissions of defendant in Document No. 74. Defendant objects to the relevance of the crime bond and states that plaintiff misstates KBS's response in Doc. 74.

The above factual statement is supported by Ex. 7 to the D. Towle deposition and is not disputed by the parties. As the above statement relates to the crime bond, I find it is irrelevant to the case at bar.

156. **Attached to and made a part thereof KBS Crime Bond No. 4977AR and D&O Policy No. DL1859AR were the respective KBS application and renewal forms which had been filled out by SNB and signed by Richard Wilson on August 23, 2000, and then provided to defendant KBS prior to September 26, 2000.**

In support of this statement, defendant cites to the alleged admissions of defendant in Document No. 74. Defendant objects to the relevance of the crime bond and states that plaintiff misstates KBS's response in Doc. 74.

Document No. 74 does not support the above factual statement. The statement is supported by the bond and policy themselves, however, and is not disputed by defendant. As the above statement relates to the crime bond, I find it is irrelevant to the case at bar.

157. The aforesaid 2000 KBS crime bond application attached to the aforesaid Crime Bond No. 4977AR answered "Yes" to the question of whether or not an MOU existed.

For the reasons discussed above, I find this factual statement is irrelevant to the case at bar.

**158. The aforesaid 2000 KBS D&O liability application attached to the aforesaid D&O Policy No. DL1859AR had the three aforementioned questions blank and the word "None" had not been written in the blanks provided to do so.**

This fact is supported by the D&O policy and is not disputed by the parties.

159. Contained within said applications attached to said policies was notice of the existence of the December 14, 1998 MOU.

Defendant objects to this statement as legal argument. As discussed above, the unauthenticated D&O application disclosed that either an MOU or a Cease and Desist order had been received from a supervisory authority. Plaintiff has provided no evidence that the content or any specific identification of the MOU was ever provided to KBS. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, improper legal argument, and irrelevant to the case at bar.

160. Contained within said applications attached to said policies was knowledge of the existence of the December 14, 1998 MOU.

Defendant objects to this statement as legal argument. As discussed above, the unauthenticated D&O application disclosed that either an MOU or a Cease and Desist order had been received from a supervisory authority. Plaintiff has

provided no evidence that the content or any specific identification of the MOU was ever provided to KBS. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, improper legal argument, and irrelevant to the case at bar.

161.    On September 26, 2000, defendant KBS had notice of the existence of the December 14, 1998 MOU.

Defendant objects to this statement as legal argument. As discussed above, the unauthenticated D&O application disclosed that either an MOU or a Cease and Desist order had been received from a supervisory authority. Plaintiff has provided no evidence that the content or any specific identification of the MOU was ever provided to KBS. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, improper legal argument, and irrelevant to the case at bar.

162.    On September 26, 2000, defendant KBS had knowledge of the existence of the December 14, 1998 MOU.

Defendant objects to this statement as legal argument. As discussed above, the unauthenticated D&O application disclosed that either an MOU or a Cease and Desist order had been received from a supervisory authority. Plaintiff has provided no evidence that the content or any specific identification of the MOU was ever provided to KBS. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the

above statement is disputed, improper legal argument, and irrelevant to the case at bar.

163.    On September 26, 2000, defendant KBS had notice that the MOU was applicable to the SNB Board.

Defendant objects to this statement as legal argument. As discussed above, the unauthenticated D&O application disclosed that either an MOU or a Cease and Desist order had been received from a supervisory authority. Plaintiff has provided no evidence that the content or any specific identification of the MOU was ever provided to KBS. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, improper legal argument, and irrelevant to the case at bar.

164.    On September 26, 2000, defendant KBS had knowledge that the MOU was applicable to the SNB Board.

Defendant objects to this statement as legal argument. As discussed above, the unauthenticated D&O application disclosed that either an MOU or a Cease and Desist order had been received from a supervisory authority. Plaintiff has provided no evidence that the content or any specific identification of the MOU was ever provided to KBS. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, improper legal argument, and irrelevant to the case at bar.

165.    Throughout policy period October 7, 2000 to October 7, 2001, defendant KBS has notice of the existence of the December 14, 1998 MOU.

Defendant objects to this statement as legal argument. As discussed above, the unauthenticated D&O application disclosed that either an MOU or a Cease and Desist order had been received from a supervisory authority. Plaintiff has provided no evidence that the content or any specific identification of the MOU was ever provided to KBS. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, improper legal argument, and irrelevant to the case at bar.

166.    Throughout policy period October 7, 2000 to October 7, 2001, defendant KBS had knowledge of the existence of the December 14, 1998 MOU.

Defendant objects to this statement as legal argument. As discussed above, the unauthenticated D&O application disclosed that either an MOU or a Cease and Desist order had been received from a supervisory authority. Plaintiff has provided no evidence that the content or any specific identification of the MOU was ever provided to KBS. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, improper legal argument, and irrelevant to the case at bar.

167.    Throughout policy period October 7, 2000 to October 7, 2001, defendant KBS had notice that the MOU was applicable to the SNB Board.

Defendant objects to this statement as legal argument. As discussed above, the unauthenticated D&O application disclosed that either an MOU or a Cease and Desist order had been received from a supervisory authority. Plaintiff has provided no evidence that the content or any specific identification of the MOU was ever provided to KBS. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, improper legal argument, and irrelevant to the case at bar.

168.     Throughout policy period October 7, 2000 to October 7, 2001, defendant KBS had knowledge that the MOU was applicable to the SNB Board.

Defendant objects to this statement as legal argument. As discussed above, the unauthenticated D&O application disclosed that either an MOU or a Cease and Desist order had been received from a supervisory authority. Plaintiff has provided no evidence that the content or any specific identification of the MOU was ever provided to KBS. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, improper legal argument, and irrelevant to the case at bar.

169.     **On September 26, 2000, defendant KBS by letter forwarded KBS Crime Bond No. 4977AR and KBS D&O Policy No. DL1859AR to SNB for policy period October 7, 2000 to October 7, 2001 with a premium billing for said policies.**

This statement is supported by the September 26 letter and Ex. 10 of the D. Towle deposition, and is not disputed by the parties. As the above statement relates to the crime bond, I find it is irrelevant to the case at bar.

170. **Defendant KBS considered 2000 KBS Crime Bond No. 4977AR and 2000 KBS D&O Policy No. DL1859AR sold and issued to SNB to be a renewal of coverage SNB had under 1999 KBS Crime Bond No. 3661AR and 1999 KBS D&O Policy No. DL9841AR which had been sold and issued to NWNB.**

This statement is supported by the testimony of Donald Towle. Defendant KBS objects that this statement contains legal argument that should not be considered, but does not expound on this argument. I therefore find the above fact to be undisputed. As the above factual statement relates to the crime bond, I find it is irrelevant to the case at bar.

171. **SNB paid all premiums for 2000 KBS Crime Bond No. 4977AR and 2000 D&O Policy No. DL1859AR.**

This statement is supported by Ex. 7 of the D. Towle deposition and is not disputed by the parties. As this statement relates to the crime bond, I find it is irrelevant to the case at bar.

172. SNB met all conditions precedent to obtaining coverage under 2000 KBS Crime Bond No. 4977AR and 2000 D&O Policy No. DL1859AR.

Defendant objects to the above statement as improper legal argument. Defendant further states that there is no claim being asserted under the crime bond in this litigation. Defendant's objections are sustained.

173.    Defendant KBS recommended, sold, issued, and/or renewed 2000 KBS Crime Bond No. 4977AR and 2000 D&O Policy No. DL1859AR to SNB for policy period October 7, 2000 to October 7, 2001 with the notice and knowledge of the MOU defendant KBS had acquired or should have acquired during the application process for 1999 KBS Crime Bond No. 3661AR and 1999 KBS D&O Policy No. DL9841AR which defendant KBS had recommended, sold, issued, and/or renewed to NWNB for the policy period October 7, 1999 to October 7, 2000, as well as the notice and knowledge defendant KBS acquired of the MOU during said policy period of October 7, 1999 to October 7, 2000.

As discussed above, plaintiff has not offered any evidence that defendant recommended the crime bond or the D&O policy to SNB. Defendant objects to the above statement as legal argument and as irrelevant. For the reasons discussed above, defendant's objections are sustained.

174.    1999 KBS Crime Bond No. 3661AR and 1999 KBS D&O Policy No. DL9841AR recommended, sold, issued, and/or renewed to NWNB by defendant KBS for policy period October 7, 1999 to October 7, 2000 were authorized, signed, and dated October 7, 1999 by Donald M. Towle, President of defendant The Kansas Bankers Surety Company and S.R. Watkins, Secretary of The Kansas Bankers Surety Company.

As discussed above, plaintiff has not offered any evidence that defendant recommended the crime bond or the D&O policy to SNB. Defendant objects to the above statement as legal argument and as irrelevant. KBS does not dispute that it issued the bond and policies to SNB for the year referenced, as is reflected

extensively in the preceding factual statements. Even if the above statement were true, it would not offer any additional support to plaintiff's claims. I therefore find the above statement is disputed in part, improper legal argument, and irrelevant to the case at bar.

175.    2000 KBS Crime Bond No. 4977AR and 200 KBS D&O Policy No. DL1859AR recommended, sold, issued, and/or renewed to NWNB by defendant KBS for policy period October 7, 2000 to October 7, 2001 were authorized, signed, and dated October 7, 2000 by Donald M. Towle, President of defendant The Kansas Bankers Surety Company and S.R. Watkins, Secretary of The Kansas Bankers Surety Company.

As discussed above, plaintiff has not offered any evidence that defendant recommended the crime bond or the D&O policy to SNB. Defendant objects to the above statement as legal argument and as irrelevant. KBS does not dispute that it issued the bond and policies to SNB for the year referenced, as is reflected extensively in the preceding factual statements. Even if the above statement were true, it would not offer any additional support to plaintiff's claims. I therefore find the above statement is disputed in part, improper legal argument, and irrelevant to the case at bar.

176.    In 1999 NWNB was listed for sale by NWNB with DD&F Consulting of North Little Rock, Arkansas.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition and Ex. 23 of the C. Towle 30(b)(6) deposition. Neither of these exhibits has been authenticated to this court. Even if the above statement were

true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

177.    In 1999 NWNB was on an OCC watch list.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition. This exhibit has not been authenticated to this court. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

178.    In 1999 NWNB was on an FDIC watch list.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition. This exhibit has not been authenticated to this court. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

179.    In 1999 NWNB was one of the poorest performing banks in Arkansas.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition. This exhibit has not been authenticated to this court. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

180.    In 1999 NWNB had a book of under- or poorly performing loans that had been directly or indirectly generated by NWNB insiders.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition. This exhibit has not been authenticated to this court. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

181.    In 1999 NWNB's composite CAMELS rating was 3.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition. This exhibit has not been authenticated to this court. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

182.    In 1999 NWNB was undercapitalized.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition. This exhibit has not been authenticated to this court. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

183.    In 1999 and early 2000 NWNB was not in compliance with the MOU.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition. This exhibit has not been authenticated to this court. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

184.     By early 2000 NWNB had experienced high turnover rates in senior management, to include three presidents, four cashiers, and three Board members.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition. This exhibit has not been authenticated to this court. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

185.     By early 2000 the OCC had discovered numerous lending deficiencies at NWNB.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition. This exhibit has not been authenticated to this court. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

186.     Damian Sinclair had formed and grown Sinclair Financial Group into a $50,000,000.00 business.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition. This exhibit has not been authenticated to this court. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

187.     In July 1999 Damian Sinclair sold Sinclair Financial Group to Stevens Financial Group.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition. This exhibit has not been authenticated to this court. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

188.    In late 1999 Damian Sinclair agreed to buy NWNB for $2.5 million plus a capital injection of $2 million.

In support of this statement, McAninch cites to Ex. 6 of the D. Towle deposition. This exhibit has not been authenticated to this court. Even if the above statement were true, it would not tend to show that any of plaintiff's claims are meritorious. I therefore find the above statement is disputed, based on unauthenticated evidence, and irrelevant to the case at bar.

189.    Damian Sinclair operated SNB from March 2, 2000 until September 7, 2001.

In support of this statement, McAninch cites to the unauthenticated Ex. 5 of the D. Towle deposition, and to deposition testimony of C. Towle. The testimony cited does not relate to Damian Sinclair's operation of SNB and does not support the above statement. Defendant does not dispute that Damian Sinclair served as director of SNB from March 2, 2000 until September 7, 2001, as is reflected elsewhere in these factual findings. I therefore find the above statement is not supported by any evidence of record.

190.    **On July 10, 2001, Bonnie J. Pinnick, Vice-President of defendant KBS wrote on KBS letterhead to Richard Wilson, President of SNB, forwarding**

**2001 Annual Application and Renewal Forms attempting to renew SNB's KBS crime bond and D&O coverage for another year for policy period October 7, 2001 to October 7, 2002, and in part stated:**

> **After we receive the completed renewal forms, we will figure the premium and provide your Bank with renewed protection well before the expiration date of your current coverage.**

In support of this statement, McAninch cites to the July 10 letter, Ex. 11 of the D. Towle deposition, as well as deposition testimony of D. Towle. Mr. Towle testified "we're sending out the renewal form for the bank to fill out and return to us if they elect to renew it." Over the objection of defense counsel, Mr. Towle did agree with plaintiff's counsel's statement that "you're attempting to renew policy [sic] for another term." I therefore find the above statement is undisputed.

191.     On September 10, 2001, Lynn Crouse, Assistant Corporate Secretary of Defendant KBS, on KBS letterhead wrote to Richard Wilson, President of SNB, enclosing a check and voucher refunding the premiums for the bonds and policies for SNB effective September 7, 2001, but stating no reason, explanation or KBS Crime Bond or KBS D&O Policy language for the refund.

In support of this statement, McAninch cites the September 10 letter, Ex. 13 of the D. Towle deposition. Defendant controverts this statement in part, stating that in a separate letter Donald Towle advised SNB that the bond terminated due to takeover by the FDIC and that the D&O Policy would expire by its terms on October 7, 2001. Defendant denies that the D&O Policy was cancelled or attempted to be cancelled before October 7, 2001. This assertion is

90

supported by the testimony of D. Towle. Because defendant does not assert cancellation of the D&O policy as a defense to coverage in the instant case, and because no claims under the crime bond are pending, I find the above statement of fact to be irrelevant to the case at bar.

192.    On September 10, 2001, defendant KBS sent a Premium Statement on defendant KBS letterhead to SNB showing a premium refund on 2000 KBS Crime Bond No. 4977AR and 2000 D&O Policy No. DL1859AR and other KBS policies, all issued to SNB with a notation under each entry of the Coverage column stating: "Bank Failed 09/07/2001" and a "Paid" stamp dated "SEP 10, 2001."

       In support of this statement, McAninch cites to Ex. 14 of the D. Towle deposition. Defendant controverts this statement in part, stating that in a separate letter Donald Towle advised SNB that the bond terminated due to takeover by the FDIC and that the D&O Policy would expire by its terms on October 7, 2001. Defendant denies that the D&O Policy was cancelled or attempted to be cancelled before October 7, 2001. This assertion is supported by the testimony of D. Towle. Because defendant does not assert cancellation of the D&O policy as a defense to coverage in the instant case, and because no claims under the crime bond are pending, I find the above statement of fact to be irrelevant to the case at bar.

193.    D. Towle Deposition Exs. 13 and 14 were part of an attempt by defendant KBS to cancel 2000 KBS Crime Bond No. 4977AR and D&O Policy No. DL1859AR effective September 10, 2000.

Defendant controverts this statement in part, stating that in a separate letter Donald Towle advised SNB that the bond terminated due to takeover by the FDIC and that the D&O Policy would expire by its terms on October 7, 2001. Defendant denies that the D&O Policy was cancelled or attempted to be cancelled before October 7, 2001. This assertion is supported by the testimony of D. Towle. Because defendant does not assert cancellation of the D&O policy as a defense to coverage in the instant case, and because no claims under the crime bond are pending, I find the above statement of fact to be irrelevant to the case at bar.

194.    Neither D. Towle Deposition Ex. 13 or 14 cites, quotes, or mentions any policy language, especially Exclusion language, from KBS Crime Bond No. 4977AR and D&O Policy No. DL1859AR as to why the policies are being cancelled.

Defendant controverts this statement in part, stating that in a separate letter Donald Towle advised SNB that the bond terminated due to takeover by the FDIC and that the D&O Policy would expire by its terms on October 7, 2001. Defendant denies that the D&O Policy was cancelled or attempted to be cancelled before October 7, 2001. This assertion is supported by the testimony of D. Towle. Because defendant does not assert cancellation of the D&O policy as a defense to coverage in the instant case, and because no claims under the crime bond are pending, I find the above statement of fact to be irrelevant to the case at bar.

195.    On September 11, 2001, Donald M. Towle, president of defendant KBS, sent a letter on KBS letterhead to SNB stating 2000 KBS "Crime Bond No. 4977AR was terminated as an entirety on or before September 7, 2001" and

further stating that "[d]espite our requests, the bank has not completed and returned the renewal applications" and quoting parts of "the bond, Conditions and Limitations, Section 12…"

This statement is supported by the September 11 letter and is not disputed by the parties. Because no claims under the bond are currently pending, I find the above factual statement to be irrelevant to the case at bar.

196. Said September 11, 2001 letter further states as follows:

> Directors, Officers, and Employees Indemnity and Bank Lender Liability Policy No. DL 1859 AR, Check Kiting Fraud Indemnification Policy No. CK 9987 AR and Bank Employment Practices Policy No. EP 6431 AR also expire in accordance with their terms on October 7, 2001. Despite our requests, the bank has no completed and returned the renewal applications. Kansas Bankers Surety Company is no longer willing to renew such policies. The policies shall expire on October 7, 2001 and will not be renewed.

This statement is supported by the September 11 letter and is not disputed by the parties. Because defendant does not assert expiration of the D&O policy as a defense to the pending claims under that policy, I find the above factual statement is irrelevant to the case at bar.

197. Said September 11, 2001 letter cites no Exclusion or other policy language from KBS D&O Liability Policy No. DL1859AR or KBS Crime Bond No. 3661AR or D&O Policy DL9841AR issued to NWNB for policy period October 7, 1999 to October 7, 2000.

This statement is not supported by the September 11 letter, which indicates that the crime bond would terminate due to the taking over of the Bank by the FDIC. It also references the failure of the bank to return its renewal

applications in accordance with policy terms. Because defendant does not rely on the September 11 letter as a defense to the pending claims, and because no claims are currently pending under the crime bond, I find the above statement of fact is irrelevant to the case at bar.

198.    Said September 11, 2001 letter cites no exclusion or other policy language from KBS Crime Bond No. 4977AR other than portions of "…the bond, Conditions and Limitations, Section 12…".

199.    Ex. 15 D. Towle Deposition was personally written by Donald M. Towle, President of defendant KBS.

This statement is not supported by the September 11 letter, which indicates that the crime bond would terminate due to the taking over of the Bank by the FDIC. It also references the failure of the bank to return its renewal applications in accordance with policy terms. Because defendant does not rely on the September 11 letter as a defense to the pending claims, and because no claims are currently pending under the crime bond, I find the above statement of fact is irrelevant to the case at bar.

200.    **On September 11, 2001, when Donald M. Towle, President, wrote and sent Ex. 15, Donald Towle was the highest ranking officer of defendant KBS, had been president since 1973, and as of his deposition on February 8, 2005, had worked for defendant KBS for 38 years.**

This statement is supported by the deposition testimony of Donald Towle and is not disputed by the parties.

201. On September 11, 2001, Charles M. Towle, Senior Vice-President of defendant KBS, saw Ex. 15 and discussed it with Donald M. Towle, president of defendant KBS.

In support of this statement, McAninch cites to the deposition testimony of Charles Towle. Mr. Towle testified that he did not specifically recall seeing the document when it was sent or having any discussions with President Towle about the letter, although he believed he would have seen it and considered it "highly likely" that he had discussions with President Towle. This testimony does not adequately support the above statement of fact. Because defendant does not rely on the September 11 letter as a defense to the pending claims, and because no claims are currently pending under the crime bond, I find the above statement of fact is irrelevant to the case at bar.

202. The September 11, 2001 letter from Donald M. Towle to SNB did not cancel or attempt to cancel D&O Policy No. DL1859AR.

Defendant does not dispute the above statement of fact. Because defendant does not rely on the September 11 letter as a defense to the pending claims under the D&O policy, I find the above statement of fact is irrelevant to the case at bar.

203. The September 10, 2001 letter from Lynn Crouse, Assistant Corporate Secretary of defendant KBS, to SNB; the September 10, 2001 KBS Premium Statement; the voucher and the check or draft causing KBS to mark said Premium Statement as "paid" all were an attempt by defendant KBS to cancel KBS Crime Bond No. 4977AR and KBS D&O Policy No. DL1859AR issued to SNB.

Defendant disputes this statement of fact, objecting on the grounds of relevance of the crime bond. Defendant states that the crime bond terminated by its terms upon takeover, and the D&O policy was not renewed. Defendant refers to the testimony of Charles Towle that Secretary Crouse made a technical error in refunding the premium for the D&O that was brought to his attention and corrected. Because defendant does not rely on the cancellation of the D&O policy as a defense to the pending claims, and because no claims under the crime bond have been asserted, I find the above statement of fact is irrelevant to the case at bar.

204. **On September 26, 2001, Eli Greenberg, attorney for SNB, wrote defendant KBS "Express Mail R.R.R.," a two-page letter specifically referencing "Policy Number: DL1859AR" and "Bond Number 4977AR" and specifically informing defendant KBS that "[t]he FDIC was appointed receiver for [SNB] on September 7, 2001" and that "[t]he FDIC has provided oral, informal notice that there may be claims against the officers and directors of [SNB] for negligence, breach of fiduciary duty and possibly other wrongful conduct" specifically naming Damian Sinclair.**

The above statement is supported by the September 26, 2001, letter, and is not disputed by the parties.

205. The September 26, 2001 attorney Greenberg letter put defendant KBS on notice of claim, claims made, and losses prior to the October 7, 2001 expiration of KBS D&O Policy No. DL1859AR.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained. The letter does not assert any specific claims under the policy but provided notice of possible claims that might be brought in the future.

206.    The September 26, 2001 attorney Greenberg letter put defendant KBS on notice of facts that it was the intention of a party to hold SNB and Damian Sinclair responsible for a wrongful act as defined in KBS D&O Policy No. DL1859AR.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained. The letter does not assert any specific claims under the policy but provided notice of possible claims that might be brought in the future.

207.    The claims made against SNB and Damian Sinclair by the United States of America and the State of Missouri relate back and are treated as a claim made during the policy period in which notice was given to defendant KBS.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained. The letter does not assert any specific claims under the policy but provided notice of possible claims that might be brought in the future.

208.    **On September 27, 2001, Helen Davis Chaitman, attorney for SNB, wrote defendant KBS via Express Mail a one-page letter specifically referring to "Sinclair National Bank D&O Policy No. DL1859AR; Bond No. 4977AR" and specifically informed defendant KBS that attorney Chaitman was "writ[ing] further to our letter dated September 27, 2001 giving notice to you of a possible claim against the directors and officers of [SNB] by the FDIC, as receiver for the bank, or possibly, by the Office of the Comptroller**

of Currency (OCC)" and that she had "received a subpoena from the OCC demanding" production of the files relating to SNB and SNB's officers and directors. Further inquiring "if you [KBS] will provide counsel to respond to this subpoena."

The above factual statement is supported in part by the September 27 letter. Defendant KBS disputes the statement in part, offering the correction that the letter references a demand on Ms. Chaitman's law firm to produce the files. I find the above statement, as corrected, is undisputed.

209. The September 27, 2001 attorney Chaitman letter put defendant KBS on notice of a claim, claims made, and losses prior to the October 7, 2001, expiration of KBS D&O Police No. DL1859AR.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained.

210. The September 27, 2001 attorney Chaitman letter put defendant KBS on notice of facts that it was the intention of a party to hold SNB and Damian Sinclair responsible for a wrongful act as defined in KBS D&O Police No. DL1859AR.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained.

211. Claims made against SNB and Damian Sinclair by the United States of America and the State of Missouri relate back and are treated as a claim made during the policy period in which notice was given to defendant KBS.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained. Defendant denies any knowledge of claims made against SNB as referenced, and plaintiff has provided no evidence of such claims.

212.   On September 28, 2001, attorney Helen Davis on behalf of SNB and Damian Sinclair, and Senior Vice-President Charles M. Towle of KBS spoke by telephone.

In support of this statement, McAninch cites to the factual findings of this court, Ex. 18 of the D. Towle deposition, and the deposition testimony of Charles Towle. Defendant disputes the above statement in part, stating that no evidence of record reflects that Ms. Chaitman was speaking on behalf of SNB. Ex. 18, a letter memorializing the telephone conversation, indicates that a subpoena had been issued for all documents relating to Ms. Chaitman's law firm's representation of SNB, but the letter does not state that, on September 28, 2001, Ms. Chaitman was speaking on behalf of SNB. This is not a material dispute relevant to any claim or defense in this lawsuit, and the above fact is reflected in other factual findings of this court.

213.   In said September 28, 2001 Chaitman/C. Towle telephone conversation attorney Chaitman informed Senior Vice-President C. Towle that "the FDIC might be making a claim against some of the directors and officers [of SNB] she represented" and Sr. Vice-President Towle "read to her [Exclusion 3] mentioned in this letter and asked her to keep [KBS] informed."

Defendant disputes that Ms. Chaitman was speaking on behalf of SNB, stating that the communication that took place is uncontroverted in the record. Defendant's objection is sustained.

214. Said September 28, 2001 Chaitman/C. Towle telephone conversation was notice to defendant KBS of claims, claims made, and losses prior to the October 7, 2001, expiration of KBS D&O Policy No. DL1859AR.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained.

215. Said September 28, 2001 Chaitman/C. Towle telephone conversation was an attempted denial of coverage by defendant KBS through Senior Vice-President C. Towle who allegedly read only to attorney Chaitman Exclusion 3 of KBS D&O Policy No. DL1859AR and no other policy language, no language from KBSCrime Bond No. 4977AR, or any KBS crime bond or KBS D&O liability policy issued to NWNB.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained.

216. **On October 8, 2001, Senior Vice-President Charles M. Towle of KBS on KBS letterhead wrote to attorney Helen Davis Chaitman acknowledging receipt of attorney Chaitman's September 27, 2001 letter reporting receipt of a subpoena demanding production of all files relating to the Bank and its directors and officers and that there may in the future be claims against the directors and officers of the bank. Further acknowledging the Chaitman/C. Towle telephone conversation of September 28, 2001, where they discussed**

**Policy No. DL1859AR, Section VI Exclusion (3) and finally asking that "[I]f any party, other than a state or federal official or agency brings any action against any director, officer, or employee of [SNB] please let us know promptly."**

The above statement is supported by the October 8 letter and is not disputed by the parties.

217.    The written policy standard for the reporting to defendant KBS of claims, claims made, or losses is not "brings any action," as stated in Ex. 18 D. Towle Deposition under 2000 KBS D&O Policy No. DL1859AR, but rather is the definition of "Discovery," namely "when any Director or Officer or Employee first becomes aware of facts that would cause a reasonable man to assume that a Loss covered has been or will be incurred."

Defendant objects to the above statement as legal argument. Defendant's objection is sustained.

218.    Ex. D Towle Deposition was an attempt by defendant KBS through Senior Vice-President Charles M. Towle to deny coverage under KBS D&O Policy No. DL1859AR, utilizing the sole policy reference of Section IV, Exclusion (3) and makes no denial under KBS Crime Bond No. 4977AR or any prior policies or bonds issued  by KBS to NWNB.

Defendant does not dispute that it advised Ms. Chaitman that there was no coverage under the D&O policy for claims asserted against the directors as discussed. Defendant otherwise objects to the above statement as legal argument, and as irrelevant as it relates to the bond. Defendant's objections are sustained.

219. **On February 28, 2005, this Court entered its Order denying defendant KBS's motion for summary judgment and sustaining plaintiff Joseph McDonald's cross-motion for summary judgment pertaining to the regulatory exclusion of Exclusion (3).**

This statement is a matter of record in this court and is not disputed by the parties.

220. **On March 4, 2003, attorney William H. McDonald on behalf of Sinclair National Bank and Damian Sinclair, wrote defendant KBS "ATTN: President Towle and Secretary Watkins" forwarding declaration sheet for KBS Crime Bond No. 4977AR and the March 3, 2003 fee agreement between Damian Sinclair and his principal attorney Pat J. Merriman." Further informing defendant KBS that attorney McDonald had "been informed that [KBS] has previously been informed, in writing, by Mr. Sinclair and/or one of his attorneys" that Damian Sinclair was "the target of investigation by the United States Attorney and the Missouri Attorney General" and most probably also other federal and state regulatory agencies concerning his activities with regard to SNB, formally tendering the defense and demanding that Damian Sinclair's fees and costs be paid and that Damian Sinclair be indemnified.**

The above statement is supported by the March 4 letter and is not disputed by the parties.

221. Ex. 19 30(b)(6) Deposition Vol. II put defendant on notice of claims, claims made, and losses under KBS D&O Policy No. DL1859AR.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained.

222. Ex. 19 30(b)(6) Deposition Vol. II put defendant KBS on notice of claims, claims made, and claimed losses by the United States of America and the State of Missouri under KBS D&O Policy No. DL1859AR.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained.

223. **On March 6, 2003, Senior Vice-President Charles M. Towle for defendant KBS wrote attorney McDonald acknowledging receipt of Ex. 19 30(b)(6) Deposition Vol. II with attachments and denied coverage under "any bond or policy underwritten by this company" citing no policy language or Exclusion under KBS Crime Bond 4977AR or D&O Policy No. DL1859AR.**

The above statement is supported by the March 6 letter. Defendant objects to the above statement as legal argument, and states that the letter speaks for itself. Defendant's objections are overruled.

224. Ex. 20 30(b)(6) Deposition Vol. II was a non-specific general denial of all coverage under any KBS bond or policy underwritten by defendant KBS.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained.

225. On September 25, 2003, attorney William H. McDonald for SNB, Damian Sinclair, and plaintiff Susan Sinclair Wintermute, wrote defendant KBS "ATTN: President Towle and Secretary Watkins" forwarding a September 12, 2003, 31-page indictment by the State of Missouri and a September 17, 2003, indictment by

the United States of American against Damian Sinclair and plaintiff Susan Sinclair Wintermute alleging they fell within KBS coverage of SNB and demanding KBS assume the defense and provide indemnification.

Defendant does not dispute that the above correspondence was sent, but disputes that the letter was written on behalf of Susan Wintermute. The letter does not support plaintiff's assertion that it was written on behalf of Susan Wintermute. The communication that took place is reflected in the factual findings of this court.

225. **On September 30, 2003, Senior Vice-President Charles M. Towle for KBS on KBS letterhead wrote attorney McDonald acknowledging receipt of Ex. 21 30(b)(6) Deposition Vol. II and attachments, specifically denying coverage under "any bond or policy underwritten by Kansas Bankers Surety Company" and specifically citing Section IV, Exclusion (3) and Section IV(b) of D&O Policy No. DL1859AR, but acknowledging that "[t]he indictments are claims made by a State and Federal official or agency in any other capacity."**

Defendant states that the letter speaks for itself. The above statement is supported by the September 30 letter and is not disputed by the parties.

226. Ex. 21 30(b)(6) Deposition Vol. II put defendant KBS on notice of claims, claims made, and losses under KBS D&O Policy No. DL1859AR.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained.

227.    Ex. 21 30(b)(6) Deposition Vol. II put defendant KBS on notice of claims, claims made, and claimed losses by the United States of America and the State of Missouri.

Defendant objects to the above statement as legal argument. Defendant's objection is sustained.

228.    **Defendant KBS was founded in 1909 and has always written fidelity insurance for commercial banks.**

This statement is supported by the deposition testimony of Donald Towle and is not disputed by the parties.

229.    **From 1980 defendant KBS expanded defendant KBS's territory and writes coverage for 1,500 to 2,000 banks throughout the Midwest.**

This statement is supported by the deposition testimony of Donald Towle and is not disputed by the parties.

230.    **Defendant KBS writes insurance in Missouri for more than 100 and less than 300 banks. President D. Towle of defendant KBS put the number at approximately 180.**

This statement is supported by the deposition testimonies of Donald Towle and Charles Towle, although both men testified that their numbers were guesses. The statements are not disputed by the parties.

231.    **Defendant KBS has agents that work exclusively for defendant as direct line writers but who are licensed in the various states where KBS writes business.**

This statement is supported by the deposition testimonies of Donald Towle and Charles Towle, although the word "exclusively" was not used in the depositions. Other than defendant's objection to this characterization of the testimony, the statement is not disputed by the parties.

232. **One of defendant KBS's employee salesmen is Mr. Bob Seibert who lives in Jefferson City, Missouri and travels from state to state and bank to bank selling defendant KBS's insurance products.**

In support of this statement, McAninch cites to the deposition testimony of Charles Towle, who stated that Mr. Seibert is the KBS salesman for Arkansas. Other than this clarification, the above statement is not disputed by the parties.

233. **Defendant KBS has conducted business in Missouri for at least 10 years.**

The above statement is supported by the testimony of Donald Towle and Charles Towle and is not disputed by the parties.

234. **Defendant KBS has been registered and licensed to do business in Missouri for at least 10 years.**

The above statement is supported by the testimony of Donald Towle and the admissions of KBS and is not disputed by the parties.

235. **Defendant KBS states on defendant KBS's letterhead "Serving the banks of America's Heartland since 1909."**

The above statement is supported by a September 10, 2001, letter from KBS and is not disputed by the parties.

236.   **Defendant KBS does business in at least the following states: Missouri, Arkansas, Kansas, North Dakota, South Dakota, Minnesota, Wisconsin, Colorado, Nebraska, Kentucky, Tennessee, Indiana, and Michigan.**

The above statement is supported by the deposition testimony of Charles Towle and Donald Towle and is not disputed by the parties. Defendant objects to the above statement on the grounds of relevance. Defendant's objection is overruled.

237.   **Defendant KBS maintains a staff of people in defendant KBS's headquarters in Topeka, Kansas that services defendant KBS's customers throughout defendant KBS's market area including those in Missouri.**

The above statement is supported by the deposition testimony of Donald Towle and is not disputed by the parties.

238.   **Defendant KBS does business in Missouri.**

The above statement is supported by the deposition testimony of Charles Towle and is not disputed by the parties.

239.   **Defendant KBS is registered to do business in Missouri.**

The above statement is supported by the deposition testimony of Charles Towle and Donald Towle and is not disputed by the parties.

240.   **Defendant KBS is registered with the Missouri Secretary of State in Missouri.**

The above statement is supported by the deposition testimony of Charles Towle and is not disputed by the parties.

241. **Defendant KBS is licensed with the Missouri Department of Insurance.**

The above statement is supported by the deposition testimony of Charles Towle and is not disputed by the parties.

242. **Damian Sinclair's business address at all times material was 3901 S. Fremont, Springfield, Missouri.**

In support of this statement, McAninch cites to the D&O Policy No. DL 1859AR. Defendant does not dispute that the policy lists Damian Sinclair's mailing address as above. Defendant states that it had no communication with SNB or Damian Sinclair in which it was advised that this was the business address other than the policy application and correspondence in the file relating to it. I find the above statement of fact is undisputed as clarified.

243. Damian Sinclair's residence at all times material herein was in Greene County, Missouri.

In support of this statement, McAninch cites to the death certificate and letters of estate of Damian Sinclair, which are not part of the record before this court. Defendant does not dispute that the policy lists Damian Sinclair's mailing address as above. Defendant states that it had no communication with SNB or Damian Sinclair in which it was advised that this was the business address other than the policy application and correspondence in the file relating to it. I find the above statement of fact is undisputed as clarified.

244. SNB had offices at 3901 S. Fremont, Springfield, Missouri.

In support of this statement, McAninch cites to the D&O Policy No. DL1859AR. The policy does not state that SNB had offices or maintained a branch in Missouri. I find the above factual statement is unsupported by any evidence in the record.

245.    The OCC had given SNB permission to conduct SNB business at 3901 S. Fremont, Springfield, Missouri.

In support of this statement, McAninch cites to the D&O Policy No. DL1859AR. The policy does not state that SNB had offices or maintained a branch in Missouri. I find the above factual statement is unsupported by any evidence in the record.

246.    SNB's upper-level management officed at 3901 S. Fremont, Springfield, Missouri.

In support of this statement, McAninch cites to unauthenticated Ex. 6 of the D. Towle deposition, which purports to be a copy of a "confidential memorandum" from Karen H Bryant, Acting Licensing Manager of the OCC, to Brenda E. McNeese, NBE/Sr. Corporate Analyst. Plaintiff has failed to properly authenticate this document under Fed. R. Evid. 901. I therefore find the above factual statement is unsupported by any evidence in the record.

247.    All SNB Board meetings were held at 3901 S. Fremont, Springfield, Missouri.

In support of this statement, McAninch cites to unauthenticated Ex. 6 of the D. Towle deposition, which purports to be a copy of a "confidential memorandum" from Karen H Bryant, Acting Licensing Manager of the OCC, to

Brenda E. McNeese, NBE/Sr. Corporate Analyst. Plaintiff has failed to properly authenticate this document under Fed. R. Evid. 901. I therefore find the above factual statement is unsupported by any evidence in the record.

248. SNB's "back room" operations were conducted at 3901 S. Fremont, Springfield, Missouri.

In support of this statement, McAninch cites to unauthenticated Ex. 6 of the D. Towle deposition, which purports to be a copy of a "confidential memorandum" from Karen H Bryant, Acting Licensing Manager of the OCC, to Brenda E. McNeese, NBE/Sr. Corporate Analyst. Plaintiff has failed to properly authenticate this document under Fed. R. Evid. 901. I therefore find the above factual statement is unsupported by any evidence in the record.

249. Stevens Financial Group was located at 3901 S. Fremont, Springfield, Missouri.

In support of this statement, McAninch cites to unauthenticated Ex. 6 of the D. Towle deposition, which purports to be a copy of a "confidential memorandum" from Karen H Bryant, Acting Licensing Manager of the OCC, to Brenda E. McNeese, NBE/Sr. Corporate Analyst. Plaintiff has failed to properly authenticate this document under Fed. R. Evid. 901. I therefore find the above factual statement is unsupported by any evidence in the record.

250. Most of SNB sub-prime lending paper purchases were at 3901 S. Fremont, Springfield, Missouri.

In support of this statement, McAninch cites to unauthenticated Ex. 6 of the D. Towle deposition, which purports to be a copy of a "confidential

memorandum" from Karen H Bryant, Acting Licensing Manager of the OCC, to

Brenda E. McNeese, NBE/Sr. Corporate Analyst. Plaintiff has failed to properly

authenticate this document under Fed. R. Evid. 901. I therefore find the above

factual statement is unsupported by any evidence in the record.

251.    Venue is proper in Missouri.

        Defendant objects to the above statement as improper legal argument. This

court has already held it has venue over this matter. Defendant's objection is

sustained.

252.    The only investigation of the claims, claims made, and losses by defendant

KBS was by Senior Vice-President Charles M. Towle who concluded that

investigation by reading the indictments.

        Defendant does not dispute that Charles Towle conducted the

investigation with regard to Sinclair and reviewed the indictments to determine if

there was possible coverage. He also testified that he might have had discussions

with Donald Towle as part of the investigation. I find the above statement

constitutes improper legal argument.

253.    **In defendant KBS's March 15, 2005, Motion for Summary Judgment,**

**defendant KBS makes the following statement:**

> **The insuring clause in all D & O insurance policies is written
> broadly to cover all claims arising out if a wrongful act as
> defined in the policy. The insurer, however, limits its liability
> exposure by expressly excluding certain risks from coverage.
> By and large, exclusions are used to exclude those risks which
> are deemed so potentially damaging that the insurer is
> unwilling to accept the liabilities represented by them. See
> Long, The Law of Liability Insurance, Vol. III § 12A.06 (1999).
> D&O policies generally exclude claims based on actions taken**

**for personal profit, gain, or advantage. The exclusion has a potentially broad range of applicability. Id. p. 8.**

The above statement is supported by defendant's brief and is not disputed by the parties.

### III. DISCUSSION

Before the court are the parties' three separate motions for summary judgment. As is demonstrated by the preceding 100 pages of factual findings, the briefs and evidence accompanying these motions are voluminous. The motions currently before the court incorporate by reference the findings and argument made in connection to the first round of summary judgment motions, as well as numerous other motions filed and ruled upon over the lengthy and contentious course of this litigation. In ruling the instant motions, this court has had to consider more than 1500 pages of legal argument and documentary and testimonial evidence. As with most matters over which much ado has been made, however, it should surprise no one that the underlying questions in this case are quite simple.

In their separate amended complaints, the plaintiffs Joseph McAninch and Susan Wintermute have brought claims against the defendant KBS. McAninch and Wintermute have each brought claims under a certain Directors and Officers indemnity policy, seeking statutory, contractual, and other damages for its alleged breach. The terms of the written insurance contract are not in dispute, other than the issue of ambiguity argued by the plaintiffs. The question presented to the court is whether the D&O policy provides coverage to plaintiffs for the events underlying this lawsuit.

In their separate complaints, McAninch and Wintermute have each brought a single tort claim apiece. McAninch asserts a claim on behalf of his decedent Damian

Sinclair for defamation. Wintermute asserts a claim in *prima facie* tort for malicious interference in her criminal defense. Although the facts underlying these tort claims overlap and relate to the contract claims, McAninch and Wintermute's tort claims do not depend upon the enforceability of the insurance policy. The question presented in these tort claims is whether the defendant has demonstrated plaintiffs' inability to prove the elements of the torts alleged.

## A. Insurance Claims

McAninch and Wintermute assert claims for wrongful denial of defense and breach of contract arising from KBS's denial of coverage under D&O Policy No. DL1859AR. Plaintiffs state they are entitled to indemnification for losses sustained in connection to the criminal defense of Damian Sinclair and Susan Wintermute in state and federal court, including attorney fees and costs.

Wintermute argues that her expenses in defending against the federal indictment are clearly a covered event under the terms of the policy as defense against a claim made for a Wrongful Act. Wintermute states that any ambiguity in the policy language must be resolved in favor of her as the insured party and that no policy exclusions apply.

McAninch does not rely on an argument that the criminal defense of Damian Sinclair is covered under the terms on the face of the policy. He argues, instead, that KBS waived and is estopped from asserting any policy exclusions or defenses and that the policy exclusions and defenses are void. As grounds for these arguments, McAninch alleges extensive factual background and interprets those facts to state that KBS insured over a certain MOU and all claims arising therefrom. McAninch also alleges that KBS

attempted an improper cancellation and general denial of coverage under the D&O Policy, thus breaching the insurance contract.

Defendant KBS states that, under the plain terms of the policy, no coverage for the criminal defense of Susan Wintermute and Damian Sinclair is available. KBS states further that exclusions apply to preclude coverage, even if such coverage exists under the indemnification agreement.

## 1. Terms of the Policy

D&O Policy No. DL1859AR states, in relevant part, as follows:

Section I
> 1. The Underwriter [KBS] … agrees:
>> (A) to indemnify each and every person who was, now is or may hereafter be a Director or Officer or Employee of the Bank for personal Loss, which the Director or Officer or Employee is legally obligated to pay by reason of any Wrongful Act solely in their capacities of Director or Officer or Employee of the Bank which is first Discovered during the Policy Period.

Wintermute asserts, and KBS does not genuinely dispute, that she has incurred expenses which she is claiming she is legally obligated to pay by reason of a "wrongful act" as defined in the policy. In its September 30, 2003 letter, KBS asserted the language of Section I, above, as well as the following definition of "Wrongful Act" to deny coverage.

Section III
> (d) "Wrongful Act" shall mean any actual or alleged
>> 1) error or misstatement; or
>> 2) misleading state; or
>> 3) act of omission; or
>> 4) breach of duty; or

114

5) breach of fiduciary duty; or

6) any other act

by the Directors or Officers or Employees in the discharge of their duties, individually or collectively, which is claimed against them solely by reason of their being Directors or Officers or Employees of the Bank.

As noted in this court's February 28, 2005 order, the indictments against Damian Sinclair and Susan Wintermute are not claims brought against them solely by reason of their being directors of the Bank. Wintermute points to a number of decisions from other jurisdictions interpreting similar provisions to hold that an allegation that an insured acted with a motive of personal gain does not preclude an insurer's liability under a policy. Wintermute also argues that, under the language of Section III(d), above, the requirement that a claim be asserted "solely by reason" of her being a director of the Bank applies only to subsection (6). Wintermute points to the use of semi-colons, rather than commas, to separate the sub-parts of the above definition. She argues that KBS could have written the provision to clearly state that the "solely" modification applied to all acts, if that was the intention of the policy.

The parties offer competing sources of persuasive authority which, at first blush, direct this court toward two opposing conclusions. On the one hand are cases which hold that allegations that a director or officer acted for personal profit do not preclude a finding that she also acted solely within her capacity of director or officer. *See, e.g., Jarvis Christian College v. National Union Fire Insurance Co. of Pittsburgh*, 197 F.3d 742, 750 (5th Cir. 1999); *Aetna Casualty and Surety Insurance. Co. v. Dannenfeldt*, 778 F.Supp. 484, 498 (D. Ariz. 1991). On the other hand are cases holding that directors and officers acting in other capacities, or in their own self-interest, are not entitled to

coverage simply because they happen to be directors and officers. *See, e.g., Beck v. American Casualty Co.*, 1990 WL 598573 (W.D. Tex. April 12, 1990) (unpublished decision); *Olson v. Fed. Ins. Co.,* 219 Cal. App. 3d 252 (Cal. App. 1990).

Overarching these apparently conflicting results are the general principles of contract interpretation followed in Arkansas,[4] as elsewhere. First, if a policy provision is clear and unambiguous, with only one reasonable interpretation possible, the court gives effect to the plain language of the policy without resorting to rules of construction. *Curley v. Old Reliable Casualty Co.*, 155 S.W.3d 711, 713 (Ark. App. 2004). Second, the different clauses of the contract must be read together and the contract construed so that all parts harmonize, if that is possible. *Pate v. U.S. Fidelity and Guaranty Co.*, 685 S.W.2d 530, 532 (Ark. App. 1985). An insurer may contract with its insured upon whatever terms are agreed upon, so long as those terms are not contrary to statute or public policy. *Atkins v. Pilot Life Insurance Co.*, 630 S.W.2d 50, 51 (Ark. App. 1982). The insured is deemed to have approved the policy with all conditions and limitations expressed therein. *Id.* Where a provision of an insurance policy is ambiguous and susceptible to two equally reasonable interpretations, the construction most favorable to the insured will be followed. *Pate*, 685 S.W.2d at 532.

The cases cited by the parties are not precisely on point to the issue at hand. In the case at bar, we are faced with circumstances that appear to be unique in the decisional law of insurance. A bank purchased an indemnity policy to cover its directors. That policy provided coverage for personal loss arising from wrongful acts claimed against the directors solely by reason of their being directors of the bank. The bank subsequently

---

[4] As discussed in the February 28 order, Arkansas law applies to plaintiffs' claims under the insurance contract.

fails and two of the directors—the majority shareholder and his wife and co-shareholder—are eventually indicted for allegedly conspiring to defraud the bank and obstruct the investigation of regulatory agencies. The charges arise out of alleged conduct occurring both prior to and during their term as directors of the bank. At least some of the charges relate to the directors voting to approve certain loans, and the indictment alleges that those votes were cast as part of a larger scheme of personal enrichment. The insurance company denies coverage for the criminal defense of the directors, citing *inter alia* the language of the insuring agreement and the definition of "wrongful act."

Unlike the *Jarvis* case cited by Wintermute, the D&O policy at issue requires that wrongful acts be *claimed against* the directors solely by reason of their being directors of the Bank. It does not simply require that the acts be committed in that capacity. Likewise, in *Dannenfeldt*, the court engaged in a factual analysis of the particular claims brought against the directors and concluded that "the lawful authority and control conferred on the insureds by virtue of their capacity as directors and officers is the sole legal footing" upon which the underlying claims were brought. *Dannenfeldt*, 778 F. Supp. at 497. The insureds argued that the underlying claims were brought against them as employees, shareholders, and individuals as well. In examining the civil complaints, however, the court found that none of the acts claimed against the insureds were undertaken in their capacities as employees. *Id.* The court found that the fact that the insureds were shareholders bore some legal significance for the purpose of insider trading allegations, but it did not "engage[] the engine of alleged wrongdoing." *Id.* at 498. Finally, the court found that the assertion that the insureds were acting in their own self-interest was not

supported by the complaints, and that the allegation of self-interested acts did not create a distinct legal capacity which bestowed authority. *Id.*

Defendant KBS argues that the court in *Dannenfeldt* refused to construe the policy to provide coverage for the directors and officers' self-dealing. The court's discussion of whether the directors and officers had been sued in their individual capacity is rather strained and ignores the emphasis in the policy on the *reason for the claim* rather than the *authority to act*.

In this case, there can be no question of Wintermute and Sinclair's motivation to act as they did. Wintermute has been acquitted of any illegal conduct as director of the Bank, and Sinclair died before his case could be tried and so is innocent as a matter of law. If Sinclair and Wintermute voted to approve certain loans for the Bank, it must be assumed that they did so strictly in their capacities as directors of the Bank. The capacity in which they acted, however, is irrelevant under the terms of the policy. What matters is the reason the claims in the indictment were brought against them.

Damian Sinclair and Susan Wintermute were not indicted solely because they were directors of Sinclair National Bank. One can imagine a variety of circumstances in which a party with a bank-related grievance would seek recompense by filing a claim against the bank directors solely in that professional capacity. Individuals who work for a bank as directors, officers, or employees are assuming a great deal of responsibility and exposure to potential liability for their own errors in judgment as well as the errors of their colleagues. The mere fact that one is a director, officer, or employee of a bank when a particular claim arises can subject that individual to liability and personal loss. The criminal indictments underlying this lawsuit were not brought under such circumstances.

The indictments exist because grand juries in state and federal court found probable cause to believe that Wintermute and Sinclair, along with a co-defendant who was not a Bank director, had committed crimes, including *inter alia* conspiracy, bank fraud, and false statements. The fact that neither Sinclar nor Wintermute was found guilty of these crimes is irrelevant. The fact that the crimes allegedly took place while Sinclair and Wintermute were Bank directors is irrelevant. The fact that the *actus reus* of at least some of the crimes charged was an action taken by Sinclair or Wintermute in their capacities of directors of SNB is irrelevant.

Looking at the terms of the policy, we must ask whether the plaintiffs sustained personal loss which they are legally obligated to pay by reason of an act in the discharge of their duties as directors of the bank, which is claimed against them solely by reason of their being directors of the bank. The answer to this question is no. The United States and Missouri governments did not elect to prosecute Sinclair and Wintermute because they were directors of the Bank and acted as such. Those governments elected to prosecute the plaintiffs because there was probable cause to believe the plaintiffs had committed criminal offenses. The operative fact subjecting plaintiffs to loss in this case is the allegation of criminal conduct, not their status as Bank directors.

Wintermute urges the court to interpret the policy differently. She argues that the definition of "wrongful act" in the policy requires only that "any other act" be claimed against the directors solely by reason of their being directors. Wintermute states that, at a minimum, her proposed construction of the contract is reasonable and creates an ambiguity which must be resolved in her favor. I find that the policy read as a whole does not support Wintermute's interpretation. For the "solely by reason" provision to apply

only to Section III(d)(6) ("any other act"), one would have to ignore the physical layout of subsection (d), as well as the language used. Wintermute argues that because sub-parts 1 through 6 of subsection (d) are separated by semicolons rather than commas, the latter part of subsection (d), including the "solely by reason" provision, should be read in conjunction with only subpart 6. Subsection (d) is formatted in such a way that clearly supports the opposite conclusion, however. If Wintermute's interpretation were the correct one, or even a reasonable one, subsection (d) would appear as follows:

> (d) "Wrongful Act" shall mean any actual or alleged:
>> 1) error or misstatement; or
>> 2) misleading state; or
>> 3) act of omission; or
>> 4) breach of duty; or
>> 5) breach of fiduciary duty; or
>> 6) any other act by the Directors or Officers or Employees in the discharge of their duties, individually or collectively, which is claimed against them solely by reason of their being Directors or Officers or Employees of the Bank.

Instead, the policy is formatted in this way:

> (d) "Wrongful Act" shall mean any actual or alleged:
>> 1) error or misstatement; or
>> 2) misleading state; or
>> 3) act of omission; or
>> 4) breach of duty; or
>> 5) breach of fiduciary duty; or
>> 6) any other act
>
> by the Directors or Officers or Employees in the discharge of their duties, individually or collectively, which is claimed against them solely by reason of their being Directors or Officers or Employees of the Bank.

Any interpretation of this language which does not impose the "solely by reason" provision on each of subparts 1 through 6 is unreasonable. Such an interpretation would subject the insurer to unreasonably broad and uncertain liability, since nowhere in the policy would it clearly state that the wrongful act must be committed by the directors, officers, or employees themselves in the discharge of their duties.

I find that the policy language is not ambiguous and clearly provides coverage only for wrongful acts claimed against directors solely by reason of their being directors of the Bank. I find further that the indictments against Damian Sinclair and Susan Wintermute are not claims brought solely by reason of their being directors of the Bank. D&O Policy No. DL1859AR therefore provides no coverage for any personal loss plaintiffs sustained by reason of acts alleged in the indictments. For this reason, defendant KBS's motion for summary judgment shall be granted as to the Declaratory Judgment and Breach of Contract claims in Wintermute's amended complaint (Document No. 63) and Counts I, II, and III of McAninch's amended complaint (Attachment 1, Document No. 90).

## 2. Waiver and Estoppel

Plaintiff McAninch argues that KBS insured over the December 14, 1998 Memorandum of Understanding from the OCC to NWNB, and all claims arising from that MOU. He argues, further, that the D&O Policy was a contract of adhesion offered on a "take-it-or-leave-it" basis, and so must be construed strictly against KBS. McAninch argues that KBS is estopped from asserting any policy defenses, including the defense of non-coverage, because it wrongfully asserted a general denial of all coverage when the

FDIC seized the Bank. Finally, McAninch argues that the D&O policy exclusions are void as contracts of adhesion, vague, ambiguous, confusing, and duplicitous.

In support of McAninch's argument that KBS insured over the MOU, he cites *Gerrish Corp. v. Universal Underwriters Insurance Co.*, 947 F.2d 1023, 1028 (2d Cir. 1991). Plaintiff does not discuss *Gerrish's* relevance to the instant matter, and it's application to the case at bar is unclear. *Gerrish* discussed the agency relationship between Universal, an insurance company, and ISO, an organization of which that company was a member, and the validity of an authorization by Universal to allow ISO to expand the coverage of its general liability policies. *Gerrish*, 947 F.2d at 1028. Nothing discussed in *Gerrish* is applicable to the instant case.

McAninch has provided absolutely no authority supporting his argument that KBS insured over the MOU and all claims arising therefrom. McAninch has submitted copious factual statements alleging that KBS had notice of the MOU and its contents prior to issuing the 1999 D&O policy to Northwest National Bank. Even if KBS did have notice of the MOU and was aware of its contents, McAninch has not demonstrated that the indictments against him fairly arose from the MOU. McAninch states that the MOU imposed duties on the Board of Directors of NWNB, and then SNB, owed to the respective banks, and that the MOU therefore constitutes a claim on the directors under the terms of the policy first discovered during the policy period. According to the unauthenticated document purporting to be the MOU in question, the Board of Directors was required to (1) complete a study of the Bank's management structure and staffing requirements in light of the Bank's present condition; (2) submit a copy of the written report of that study to the Assistant Deputy Comptroller (ADC); (3) prepare a written

three-year budget plan and submit a copy to the ADC; (4) implement and ensure adherence to a written program designed to improve and strengthen collection efforts and reduce the amount of nonperforming loans, and submit a copy of this program to the ADC; (5) implement and ensure adherence to a written program designed to improve and strengthen credit and collateral analysis; (6) obtain current and satisfactory credit information on all loans lacking such information; (7) ensure proper collateral documentation is maintained on all loans; (8) grant, renew, alter, or restructure loans only after certain conditions are met; (9) immediately take steps to correct each violation of law, rule, or regulation cited in the Report of Examination and notify the ADC of the date and manner in which each correction was effected; (10) adopt and implement specific procedures to prevent future violations; and (11) adopt and implement procedures to prevent any further violations cited in any future Report of Examination.

No copy of the Report of Examination, authenticated or unauthenticated, has been provided to this court, but there is nothing to indicate that the "violations of law, rule, or regulation" referenced in the MOU would have led to the criminal indictment of any Bank director if left uncorrected. In short, nothing in the MOU suggested that the directors of NWNB or their predecessors at SNB were engaging in conduct that would lead to indictments for conspiracy, bank fraud, or obstruction of a bank examination. Even if the contents of the MOU were known to KBS, nothing in the MOU gave rise to a legal obligation to pay any amount that could be indemnified under the D&O policy. Even if the MOU did give rise to such a loss under the policy, there is nothing that connects the obligations imposed by the MOU to the indictments against Damian Sinclair and Susan Wintermute. And even if the indictments were connected to the obligations

imposed by the MOU, and KBS was aware of the possibility of such future claims when it issued the D&O policy, the policy is specifically written to provide no coverage for such claims, as discussed above.

Under Arkansas law, the defense of noncoverage is waived only when the insurer's conduct misleads the insured into believing that coverage exists and the insured takes action in reliance on that misrepresentation. *Harasyn v. St. Paul Guardian Insurance Co*., 75 S.W.3d 696, 701-02 (Ark. 2002). Unless the legislature has specifically prohibited a particular exclusion from coverage, courts may not find restrictions from coverage void as against public policy. *Id*. at 699. There has been no allegation, let alone proof, that KBS misrepresented the coverage offered by its D&O policy, or that Sinclair or Wintermute relied on any such misrepresentation to their detriment. McAninch has cited to no statutory authority prohibiting any exclusion or limitation on coverage in D&O Policy No. DL1859AR.

McAninch points to KBS's letter of September 10, 2001, which purported to cancel both the D&O Policy and the Bank Crime Bond and refund the premiums paid on both policies. He states that this letter amounts to an improper attempt to assert a general denial of all coverage without citation to any policy language or defense, and that KBS waived all policy defenses and exclusions. In support of this contention, McAninch cites to *Delmar Bank of University City v. Fidelity & Dep. Co. of Maryland*, 428 F.2d 32 (8th Cir. 1970). In *Delmar*, the Eighth Circuit applied Missouri law to hold that when a bonding company or insurance company denies liability on one basis, it waives all defenses to the claim not asserted in the declination of payment. In *Delmar*, however, the insurance company did not raise the defense ultimately relied on to dismiss the complaint

until after the plaintiff had filed an action for wrongful denial of coverage and the case had been argued and submitted. *Delmar*, 428 F.2d at 35. This is distinguishable from the instant case, where, even taking all of McAninch's proffered facts as true, KBS sent an erroneous letter purporting to cancel existing policies, then followed that letter one day later with a corrected notification that the D&O policy would be allowed to expire by its terms without renewal.

KBS does not rely on the September 10, 2001, "cancellation" of coverage. It does not dispute that initial notification of the claims occurred during the policy period, even though that notification was not sent or received until after September 10, 2001. Instead, KBS relies on its September 30, 2003, letter to William McDonald, in response to Mr. McDonald's letter notifying KBS of indictments returned and pending against Damian Sinclair and Susan Wintermute. In the September 30 letter, KBS enumerated several bases for denying coverage for the criminal defense of the directors, including numerous policy exclusions and the language of the insuring agreement itself and the definition of "wrongful act." The September 10, 2001, letter purporting to cancel the D&O policy and the crime bond was not a denial of liability in response to a claim asserted. It was an erroneous notification initiated by the insurance company and promptly corrected once the error was detected. Delmar is therefore inapposite, and KBS is entitled to raise all policy defenses asserted in its initial declination of coverage.

*B. Defamation Claim*

In addition to his claims under the D&O insurance policy, McAninch asserts a claim against KBS for defamation. In his amended complaint, McAninch alleges that

> "KBS… published a written denial of coverage to Damian Sinclair on September 30, 2003… wherein KBS accused plaintiff insureds of 'criminal acts,' 'criminal dishonesty and fraud,' and 'that investors [in SNB] were defrauded' by Damian Sinclair, and that KBS by KBS' several denials of coverage and statements therein vouched for the accuracy and truthfulness of the 'Indictments' and alleged charges and when [sic] there had been no 'final adjudication,' 'final judgment,' 'final determination,' or 'final finding' regarding the same with regard to Damian Sinclair; and said statements are libelous and slanderous per se."

The communications allegedly containing the defamatory statements were directed at the State of Missouri, and Damian Sinclair, the party allegedly defamed, resided in Missouri at that time. Missouri therefore has the most significant relationship to this tort action, and so Missouri substantive law governs in the disposition of this claim. *See Restatement (Second) of Conflict of Laws* § 145.

The Missouri legislature has enacted statutes providing for the survival of actions for injury to persons or property not resulting in death. *See* Mo. Rev. Stat. §§ 537.010, 537.020. In Mo. Rev. Stat. § 537.030, however, the Missouri legislature has specifically declined to extend §§ 537.010 and 537.020 to actions for slander, libel, assault and battery, or false imprisonment. Those actions abate on the death of the plaintiff. *See Johnston v. Savings Trust Co. of St. Louis*, 66 S.W.2d 113 (Mo. 1933).

I find that McAninch's claim for slander and libel *per se* abated upon the death of Damian Sinclair in December of 2003. Defendant KBS's motion for summary judgment on Count IV of McAninch's amended complaint will therefore be granted.

### C. Prima Facie *Tort Claim*

In addition to her claims under the D&O insurance policy, Wintermute asserts a claim against KBS for malicious interference with her criminal defense, an action not

specifically contemplated by any statute but lying in *prima facie* tort. In her amended complaint, Wintermute asserts as follows:

> 29. KBS willfully and maliciously failed to produce documents subpoenaed by Wintermute's counsel, which would have assisted her in her defense of the Covered Claims, with the intention of seeking to assure Wintermute's conviction on the Covered Claims so that KBS would be in a position to assert that it had no liability under the Insurance Policy.

> 30. KBS has failed to timely indemnify Wintermute, thereby causing her damages in that she had insufficient funds to retain competent trial counsel and, as a direct result, was convicted on the two counts relating to the change in control application.

> 31. KBS is liable to Wintermute for its vexatious refusal to defend, for its malicious refusal to comply with her attorney's subpoena, for all of her legal fees and expenses incurred from August 4, 2004 on, and for punitive damages.

Wintermute's criminal defense, and the alleged interference therein, occurred entirely within the state of Missouri. Missouri therefore has the most significant relationship to this tort action, and so Missouri substantive law governs in the disposition of this claim. *See Restatement (Second) of Conflict of Laws* § 145.

As previously discussed by this court, the elements of a prima facie tort claim are as follows: (1) intentional lawful act by the defendant; (2) intent to cause injury to the plaintiff; (3) injury to the plaintiff; and (4) an absence of any justification or an insufficient justification for the defendant's act. *Porter v. Crawford & Co.*, 611 S.W.2d 265, 268 (Mo. App. 1980). KBS states that Wintermute is unable to prove elements 2, 3, and 4 in this case. Wintermute responds that there is a factual issue as to whether KBS intended to harm her when it failed to comply with the subpoena served upon it. I find that there is also a factual issue as to whether KBS did comply with the subpoena.

Therefore, factual issues as to elements 2 and 4 remain that cannot be resolved by the court on summary judgment.

As to element 3, however, there are no disputed facts. Wintermute asserts that her counsel subpoenaed KBS to produce documents which would have assisted her in the defense of what she calls the "Covered Claims." Those claims include all charges in the federal superceding indictment that relate to her tenure as director of Sinclair National Bank. Wintermute alleges that KBS failed to comply with the subpoena and her counsel was forced to conclude her defense of those claims without the benefit of the evidence KBS and Charles Towle could have provided. Assuming that this is true, and that all other elements of Wintermute's tort claim are met, however, there was no injury to the plaintiff because, as the undisputed facts show, Wintermute was acquitted of all of the "Covered Claims," notwithstanding the lack of Mr. Towle's evidence.

Wintermute's claim for damages relating to the two counts on which she was convicted rests on her assertion that KBS wrongfully refused to indemnify her for her legal defense. As discussed above, Wintermute was not entitled to indemnification under the terms of the policy. KBS's refusal was therefore justified.

Because plaintiff cannot demonstrate that she was injured by KBS's alleged failure to comply with the subpoena, her claim in *prima facie* tort must fail. Defendant KBS's motion for summary judgment on Wintermute's claim for Malicious Interference With Wintermute's Defense will therefore be granted.

### *IV. CONCLUSION*

For the above-stated reasons, it is

ORDERED that defendant KBS's motion for summary judgment is granted as to all claims and all parties. It is further

ORDERED that plaintiff Joseph McAninch's motion for summary judgment is denied. It is further

ORDERED that plaintiff Susan Wintermute's motion for summary judgment is denied. It is further

ORDERED that all motions *in limine* and other pending motions in this case, Documents No. 195, 215, 203, 206, 208, 217, and 222, are denied as moot. It is further

ORDERED that the pretrial conference scheduled for 10:00 a.m., Tuesday, May 31, 2005, is cancelled.

/s/Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 25, 2005