IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| SUSAN SINCLAIR WINTERMUTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03-03285-CV-S-REL |
| | ) | |
| THE KANSAS BANKERS SURETY CO., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the court is defendant's motion for summary judgment.
I find that plaintiff cannot establish that she suffered a "loss"
for purposes of coverage under the Directors and Officers
Liability policy. Alternatively, I find that both Exclusion No.
2 and Exclusion No. 11 apply. Therefore, defendant's motion for
summary judgment will be granted and plaintiff's motion for
partial summary judgment will be denied.

### I.  BACKGROUND

Plaintiff Susan Wintermute, former director of Sinclair
National Bank ("SNB") brought a claim[1] for declaratory judgment
and breach of contract against her insurer, Kansas Bankers Surety
Company ("KBS"), arguing that KBS wrongfully refused to defend

_____

[1]On March 3, 2004, a motion was filed seeking to substitute
the Administrator of the estate of the original plaintiff, Damian
Sinclair, and to add Susan Wintermute as a new plaintiff. That
motion was granted on July 21, 2004. Plaintiff had been indicted
by a federal grand jury on September 17, 2003, for conspiracy and
making false statements. Additional charges were added in a
superseding indictment returned on November 20, 2003.

her under a Directors, Officers and Employees Indemnity and Bank Lender Liability Policy ("D&O Policy").

On August 24, 2004, plaintiff was convicted of counts 1 and 2 of the superseding indictment. She concedes that the cost of defending against those allegations is not covered under the insurance policy. She was acquitted on the remaining four counts, 4, 6, 7, and 8.

On September 8, 2004, KBS filed a motion for summary judgment; and on October 12, 2004, plaintiff filed a motion for partial summary judgment. On February 28, 2005, I entered an order denying KBS's motion for summary judgment and denying plaintiff's motion for partial summary judgment. KBS's motion dealt exclusively with the applicability of Exclusion No. 3:

> The Underwriter shall not be liable to make any payment or provide any defense in connection with any claim for Loss made against the Bank or Directors or Officers or Employees:
>
> > 3) by any State or Federal official or agency, including but not limited to the Federal Deposit Insurance Corporation, whether such official or agency is acting as receiver, liquidator, supervisor, regulator, or in any other capacity.

I found that the criminal indictments returned against plaintiff were not claims against directors by state or federal officials or agencies.

On March 14, 2005, defendant filed another motion for summary judgment; and on March 15, 2005, plaintiff filed another motion for partial summary judgment. On May 25, 2005, I entered

2

an order granting defendant's motion for summary judgment and denying plaintiff's motion for partial summary judgment. In that order I found as follows:

> I find that the policy language is not ambiguous and clearly provides coverage only for wrongful acts claimed against directors solely by reason of their being directors of the Bank. I find further that the indictments against Damian Sinclair and Susan Wintermute are not claims brought solely by reason of their being directors of the Bank. D&O Policy No. DL1859AR therefore provides no coverage for any personal loss plaintiffs sustained by reason of acts alleged in the indictments.

Plaintiff appealed, and the Eighth Circuit Court of Appeals entered an order on March 6, 2007, reversing in part my order granting KBS's motion for summary judgment. The Court of Appeals vacated that order on June 27, 2007, and issued a new opinion. The Court of Appeals held that:

> [A]n insurer may not avoid its duty to indemnify for alleged wrongful conduct merely by arguing the director was also an owner, shareholder, etc., without some explanation as to how this dual capacity relates to or facilitated the wrongful conduct alleged. . . .

The Court of Appeals affirmed my order on the applicability of Exclusion No. 3:

> Our reading of Exclusion No. 3 is that it is designed purposely to exclude coverage for any claim for loss made by those state and federal officials and agencies whose duty it is to administratively regulate and supervise banks. An Indictment returned by a federal grand jury acting on behalf of the people of the United States is not an action by a federal "agency" or by a federal "official" within the plain meaning of Exclusion No. 3, and hence, Exclusion No. 3 does not bar coverage for Wintermute's defense costs claim.

3

On August 29, 2008, defendant filed a third motion for summary judgment; and on September 2, 2008, plaintiff filed a third motion for partial summary judgment. KBS argued that plaintiff's claims were not covered under the D&O Policy; and, even if the claims were covered, exclusions 2 and 11, quoted below, apply.

> The Underwriter shall not be liable to make any payment or provide any defense in connection with any claim for Loss made against the Bank or Directors or Officers or Employees:
>
> 2) based upon or attributable to the Directors or Officers or Employees gaining in fact any personal profit or advantage to which they were not legally entitled; or
>
> 11) brought about or contributed to by the dishonesty of the Directors or Officers or Employees.

## II. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c), Federal Rules of Civil Procedure, permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The key to determining whether summary judgment is proper is ascertaining whether there exists a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome

4

of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party. American Academy of Family Physicians v. United States, 75 A.F.T.R.2d 95-1709 (W.D. Mo. 1995), aff'd 91 F.3d 1155 (8th Cir. 1996). The party moving for summary judgment has the burden of proving that these requirements for summary judgment have been met. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

In a summary judgment analysis, a court must first consider whether there are any issues of fact. If the only issues are issues of law, then summary judgment is appropriate. Disesa v. St. Louis Community College, 79 F.3d 92, 94 (8th Cir. 1996). If issues of fact are raised, a court must consider whether these issues are material to the outcome of the case. Materiality is identified by the substantive law that is to be applied. Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. Factual disputes that are collateral to the substantive law will not preclude summary judgment. Id.

In addition to the requirement that a dispute of fact be material, the dispute must also be genuine. A dispute of fact is considered genuine if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party. Id. at 249. When considering a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its

5

favor.  Id. at 255.  If the evidence submitted by the non-moving party is merely colorable or is not significantly probative, then summary judgment may be granted.  Id. at 249-250.

Where the party moving for summary judgment does not bear the burden of proof at trial, that party must show "that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  This burden is met when the moving party identifies portions of the record demonstrating an absence of a genuine issue of material fact. Id. at 323.  If the moving party meets the requirement, the burden shifts to the non-moving party who must set forth specific facts showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 474 U.S. at 248.  The trial judge then determines whether a trial is needed -- "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.

## III. UNCONTROVERTED FACTS

Below are the facts offered by defendant which I find to be uncontroverted by the record before me.  In addition, I incorporate all of the facts I have found to be undisputed in previous summary judgment orders in this case.

1.   Susan Wintermute ("Wintermute") concedes that the costs of defending against count 1 and count 2 of the superseding

6

indictment are not covered under the D&O Policy.

2.    Wintermute only seeks coverage under the D&O Policy for costs in defending counts 4, 6, 7, and 8 of the superseding indictment.

3.    Counts 4 and 6 of the superseding indictment incorporate paragraphs 1 through 22 and 25 through 52 of the superseding indictment.

4.    Counts 7 and 8 of the superseding indictment incorporate paragraphs 1 through 22 and 25 through 30 of the superseding indictment.

5.    Paragraph 27 of the superseding indictment alleges that Wintermute's actions were designed to "directly and indirectly enrich [Sinclair and Wintermute]. . ."

6.    Paragraph 28 of the superseding indictment alleges that Wintermute's actions were designed to "fraudulently enrich" her personally.

7.    Paragraph 29 of the superseding indictment alleges that Wintermute's actions were designed to allow Wintermute to fraudulently use the assets of Sinclair National Bank for her own benefit.

8.    Count 4 of the superseding indictment charges Wintermute with illegal participation under 18 U.S.C. § 1005 and alleges that Wintermute intended to defraud Sinclair National

7

Bank and the Office of the Comptroller of Currency for personal gain.

9.  Count 6 of the superseding indictment charges Wintermute with misapplication under 18 U.S.C. § 656 and alleges that Wintermute intended to injure and defraud Sinclair National Bank by embezzling, abstracting, purloining and misapplying monies, funds, and credits belonging to Sinclair National Bank.

10.  Counts 7 and 8 of the superseding indictment charge Wintermute with bank fraud under 18 U.S.C. § 1344.

11.  On August 4, 2004, Wintermute was convicted of counts 1 and 2 of the superseding indictment:  conspiracy to file a false statement and filing a false statement in connection with her application for a change in control of Sinclair National Bank.

## IV. *COVERAGE UNDER THE D&O POLICY*

Defendant argues that there is no coverage under the D&O Policy in the first place, and therefore one need not get to the exclusions to determine whether summary judgment should be granted.

While defendant also argues that the above-quoted exclusions apply, plaintiff argues that none of the exclusions apply "because Wintermute's criminal prosecution was not a 'claim for Loss,' which is a condition precedent to the application of any of the Policy exclusions." (plaintiff's response, document number 266, p. 1).  Coincidentally, this is the precise argument

8

forwarded by defendant KBS on the issue of whether there is any coverage at all under the D&O Policy, and surprisingly, it is the exact opposite argument made by plaintiff in her motion for partial summary judgment. I am unclear how plaintiff can argue one interpretation in one motion and a conflicting interpretation in another motion, but that appears to be the case here.

Section IV of the D&O Policy (the exclusions) begins as follows:

> The Underwriter shall not be liable to make any payment or provide any defense in connection with any **claim for Loss** made against the Bank or Directors or Officers or Employees (under certain conditions) . . . .

(emphasis added).

Defendant's first argument, however, is that in order to qualify for any coverage under this policy, plaintiff must have suffered a "loss"; and that if plaintiff's attorney's fees are not a "loss" for purposes of the exclusions in the contract, they cannot be a "loss" for purposes of coverage.

Section I of the D&O Policy reads as follows:

> The Underwriter, in consideration of an agreed premium and subject to the Declarations made a part hereof, all of the terms, conditions, and limitations of this policy agrees:
>
> (A) to indemnify each and every person who was, now is or may hereafter be a Director or Officer or Employee of the Bank for personal **Loss** which the Director or Officer or Employee is legally obligated to pay by reason of any Wrongful Act solely in their capacities of Director or Officer or Employee of the Bank which is first Discovered during the Policy Period.

(emphasis added).

9

Section III of the D&O Policy defines Loss as follows:

(f)  "Loss" under Section I Insuring Agreement (A) shall
     mean any amount which the Directors or Officers or
     Employees are legally obligated to pay or for which the
     Bank may be required or permitted by law to pay as
     indemnity to the Directors or Officers or Employees,
     *for a claim or claims made against the Directors or
     Officers or Employees* for Wrongful Acts and shall
     include but not be limited to damages, judgments,
     settlements and costs, cost of investigation (excluding
     salaries of Officers or Employees of the bank) and
     defense of legal claims, claims or proceedings and
     appeals therefrom, cost of attachment or similar bonds,
     except as excluded from coverage under Section IV.

(emphasis added).

A thorough review of the previous filings in this case
reveals that the issue of whether plaintiff actually had a
"claim" made against her has never been decided by any court.
The Eighth Circuit Court of Appeals decided that (1) a proper
reading of the policy, i.e., one which gives meaning to all its
terms, reveals it is intended to provide coverage to directors
for claims based on conduct and for claims based on status (491
F.3d at 769); (2) an insurer may not avoid its duty to indemnify
for alleged wrongful conduct merely by arguing the director was
also an owner, shareholder, etc., without some explanation as to
how this dual capacity relates to or facilitated the wrongful
conduct alleged (491 F.3d at 772); and (3) an indictment returned
by a federal grand jury acting on behalf of the people of the
United States is not an action by a federal "agency" or by a
federal "official" within the plain meaning of Exclusion No. 3,

10

and hence, Exclusion No. 3 does not bar coverage for Wintermute's defense costs claim (491 F.3d at 772).

The question now before the court in defendant's motion for summary judgment is whether plaintiff's attorney's fees constitute a "loss" for purposes of triggering coverage under the D&O Policy.

"In reviewing an insurance policy, when the terms of the policy are clear, the language in the policy controls." <u>Curley v. Old Reliable Cas. Co.</u>, 155 S.W.3d 711, 713 (Ark. App. 2004). The court will give effect to the policy's plain language without resorting to rules of construction if the policy provision is unambiguous. <u>Id.</u>; <u>McAninch v. KBS</u>, 491 F.3d 759, 769 (8th Cir. 2007). If "the policy language is ambiguous, and thus susceptible to more than one reasonable interpretation, the policy will be construed liberally in favor of the insured and strictly against the insurer." <u>Curley v. Old Reliable Cas. Co.</u>, 155 S.W.3d at 713; <u>McAninch v. KBS</u>, 491 F.3d at 769. "Because the court is to construe language in an insurance policy in its 'plain, ordinary, and popular sense,' the fact that a term is not defined in the policy 'does not automatically render it ambiguous.'" <u>Id.</u>, quoting <u>Curley</u> at 713.

The term "loss" is defined in the contract as being the amount that must be paid "for a claim or claims made" against the director, officer or employee. The amount that must be paid is

11

clearly the attorney's fees incurred by plaintiff in defending the charges brought in the criminal indictment.  The question, then, is what is the "claim," for a loss cannot be a covered loss unless it is the result of a claim.[2]

"Claim" is not defined in the D&O Policy.  This fact does not, however, lead to the conclusion that the term is ambiguous.

> Ambiguities only exist where reasonably minded people have honest differences.  The term claim is one of the commonest terms in the law. . . .  The word claim is derived from the Latin word clarmor, "meaning a call or demand.  In its ordinary sense the term imports the assertion, demand or challenge of something as of a right. . ."

Klein v. Fidelity & Deposit Company of America, 117 Md. App. 317, 330-331 (1997), (citations omitted) quoting Insurance Corp. of America v. Dillon, Hardamon & Cohen, 725 F. Supp. 1461, 1468 (N.D. Ind. 1988).  A claim is generally understood as "a demand for something due or believed to be due." Dico, Inc., v. Employers Ins., 581 N.W.2d 607, 613 (Iowa 1998).  Random House Dictionary defines claim as a demand for something as due; an assertion of a right or an alleged right.  The American Heritage Dictionary defines claim as a demand for something as rightful or

---

[2]Plaintiff fails to address this issue, instead skipping over the "claim" part and concluding that because she suffered a loss, it must be a loss due to a claim, and because she was an officer or director and suffered a loss, that loss must be covered by the D&O Policy.  However, using that reasoning, any loss at all suffered by plaintiff while she was a director would be covered by the policy.  That is clearly not the risk KBS undertook.  The D&O Policy covers only losses **which are a result of a claim** made against plaintiff as an officer or director of the bank.

12

due.  Webster's Revised Unabridged Dictionary defines claim as a
demand of a right or supposed right; a calling on another for
something due or supposed to be due.

"Certainly the vast majority of criminal indictments cannot
even arguably be termed 'demand[s] which seek[] monetary
damages.'"  St. Paul Fire & Marine Insurance Company v. Genova,
172 F.Supp.2d 1001, 1005 (N.D. Ill. 2001).  The Genova court was
faced with the question of whether an indictment seeking
forfeiture under RICO in addition to criminal charges constituted
a "claim" for purposes of a management liability insurance
policy.  The court analyzed the issue at length and stated, in
part, as follows:

> Damages in the law describe the payment made to recoup the
> harm, measurable in monetary terms, sustained by an injured
> party at the hands of a wrongdoer-tortfeasor, contract-
> breaker or what have you.  Although that make-whole concept
> is so fundamental that citation of authority is scarcely
> required, here is a typical succinct confirmatory statement
> from 1 Dan B. Dobbs, *Law of Remedies* § 3.1, at 277 (2d ed.
> 1993):
>
>> The damages remedy is a judicial award in money,
>> payable as compensation to one who has suffered legally
>> recognized injury or harm.
>
> By sharp contrast, forfeitures flow from the notion that
> property is somehow irreparably tainted -- whether malum in
> se or malum prohibitum -- so that no private ownership can
> be claimed and the property reverts to the sovereign. . . .
>
> . . . [T]he forfeiture of ill-gotten gains to the United
> States does not in any way relieve the criminal wrongdoer of
> the obligation to make whole the victims of the offense by
> way of true restitution.  As United States v. Pelullo, 961
> F. Supp. 736, 761 (D.N.J. 1997), aff'd without published
> opinion, 185 F.3d 863 (3d Cir. 1999) has said of the

13

conceptually comparable general forfeiture statute in the criminal code:

> The forfeiture statute, 18 U.S.C. § 982, provides that "the court in imposing sentence on a person convicted of an offense in violation of section 1956, shall order that the person forfeit to the United States any property, real or personal, involved in such offense." Unlike statutory restitution provisions, the forfeiture statute makes no provision for a set-off by reason of the victim's recovery.

> In short, perhaps it might not be a stretch to characterize a demand by a crime victim to be restored financially as a "claim," but it would surely strain any proper use of language beyond the breaking point to label a forfeiture count in an indictment, one that will surrender funds to the public fisc rather than restoring those funds to the victims, as a "demand which seeks monetary damages."

St. Paul Fire & Marine Insurance Company v. Genova, 172 F.Supp.2d at 1005-1006.

The reasoning of Genova is persuasive.  The plain, ordinary and popular meaning of the word "claim" does not include a criminal indictment.  A claim is a demand for something due or believed to be due.  Plaintiff was charged in a criminal indictment that included one count of criminal forfeiture.  As the court found in Genova, I find here that the criminal indictment, even the count charging criminal forfeiture, does not constitute a "claim for loss" which would trigger coverage under the D&O Policy.

In accordance with my finding, plaintiff herself not only admits but urges the court to find that she did not suffer a "claim for loss."  In her response to defendant's motion for

14

summary judgment, plaintiff wrote, "Wintermute's criminal prosecution was not a 'claim for Loss,'". Additionally, both the district court and the court of appeals have stated (although not as a legal ruling) that there has been no claim for loss:

(1) In an order filed by me on February 28, 2005 (document number 138), at p. 14-15, the following was stated:

> Wintermute argues, further, that the exclusions of Section IV are inapplicable because they apply only to "claims for Loss." *The underlying criminal indictments in this case are not claims for loss against the plaintiffs*, but are prosecutorial claims seeking to convict plaintiffs for alleged violations of the law.
>
> I agree with plaintiffs that under the plain language of the D&O Policy, Exclusion No. 3 does not apply. Section IV of the policy excludes liability for any payment or provision of any defense in connection with certain "claim[s] for Loss made against the Bank or Directors or Officers or Employees." "Loss" is defined in the policy as "any amount which the Directors or Officers or Employees are legally obligated to pay . . . for a claim or claims made against the Directors or Officers or Employees for Wrongful Acts."
>
> Even assuming that the criminal indictments are claims made "by any State or Federal official or agency in any other capacity," *the claims are not claims for loss.*

(Emphasis added).

(2) In the opinion filed by the Court of Appeals on March 6, 2007, which was later vacated, the following was stated:

> [W]e also reject KBS's argument that Exclusion No. 3 of the D & O Policy applies. First, *the criminal prosecution of Wintermute did not involve a claim for "loss."*

(Document number 239, p. 21) (emphasis added).

15

As stated above, these statements by the district court and
the court of appeals were not findings of law as the issue before
both courts at the time was whether Exclusion No. 3 applied.
Therefore, my statement was dicta.  And as mentioned above, the
March 6, 2007, was vacated by the court of appeals, and the
official opinion does not include the statement quoted above.
However, I find that these statements support my current finding
that the plain, ordinary and popular meaning of "claim for loss"
does not include a criminal indictment.

I have found no case which holds otherwise, and indeed
plaintiff has not suggested any which actually so hold.
Plaintiff first cites Polychron v. Crum & Forster Insurance
Companies, 916 F.2d 461 (8th Cir. 1990).  That case discusses
whether a grand jury subpoena for records of a bank would
constitute a claim.[3]  In that case, the activity that occurred

---

[3]Plaintiff, in her motion for partial summary judgment at
page 13, note 9, states that the court in Polychron "held that
'claim' encompasses criminal investigations **and prosecutions**."
(emphasis added). However, that is not what the court held.  The
court held that, "Viewing a grand-jury subpoena and investigation
as 'claims' against Mr. Polychron is a reasonable construction of
the insurance policy."  At no time did the Court of Appeals hold
that a criminal indictment constituted a claim for loss.  The
district court in that case had so held; however, (1) the court
of appeals did not address that issue, and (2) the court of
appeals reversed the opinion of the district court.  Finally, the
grand jury investigation in Polychron involved a violation of the
Currency and Foreign Transactions Reporting Act, 31 U.S.C. §
5311, which is a regulatory claim that only involves requirements
of filing records and reports.

Case 6:03-cv-03285-REL   Document 278   Filed 07/02/09   Page 16 of 27

during the covered period was the issuance of a grand jury
subpoena for records and an interview of the target. No
indictment was returned in that district or during the time the
insurance policy was in force. Therefore, the court could not
have decided that a criminal indictment is a "claim for loss."

Plaintiff next cites <u>Illinois Union Ins. Co. v. Berry</u>, 2006
WL 3367230 (S.D. Fla., November 17, 2006). That case is wholly
inapposite as (1) the criminal information filed included
restitution which was found to be the "claim for loss", (2) the
contract defined the word "claim" which excluded criminal or
civil fines and penalties imposed by law, (3) the insurance
contract provided for no duty to defend, and (4) the "dishonesty"
exclusion included a requirement that the dishonest conduct be
established through judgment or final adjudication.

Plaintiff cites <u>In re Enron Corp. Securities, Derivative &</u>
<u>"Erisa" Litigation</u>, 391 F. Supp. 2d 541, 573 (S.D. Tex. 2005),
which is also inapposite. In that case, the contract
specifically excluded:

> "any **fines** or **penalties imposed** in a criminal suit, action
> or proceeding, [emphasis added by the Court]" without
> mention of attorney's fees. There is also an exemption for
> claims "brought about or contributed to by the dishonest,
> fraudulent, criminal or malicious act or omission of such
> DIRECTOR or OFFICER **if a final adjudication** establishes that
> acts of active and deliberate dishonesty were committed or
> attempted with actual dishonest purpose and intent and were
> material to the cause of action so adjudicated." The first
> exclusion and part of the second exclusion would not be
> necessary if the policy did not cover defense costs for
> criminal actions. Moreover, both exclusions are limited to

17

> litigation resulting in final judgment: the penalties must
> have been "imposed" and there must be a "final adjudication"
> by a judge finding the insureds committed or attempted acts
> of dishonesty and fraud to preclude coverage.  In addition,
> the "final adjudication" requirement of these exclusions
> implies that where the insured is not found guilty, there is
> coverage for his costs and expenses in defending himself in
> a criminal action where the loss arises out of a wrongful
> act committed in his capacity as an officer or director of
> Enron.

Id. at 573-574.

The insurance contract in Enron is completely different from the insurance contract at issue in this case.

Finally, plaintiff cites National Union Fire Ins. Co. of Pittsburgh, PA v. Brown, 787 F. Supp. 1424 (S.D. Fla. 1991), aff'd 963 F.2d 385 (11th Cir. 1992)(table).  In that case, the insurance contract covered costs "incurred in the defense of actions, suits or proceedings and appeals therefrom", and the dishonesty exclusion applied only upon adjudication.  Again, the contract in Brown is completely different from the D&O Policy in this case.

The cases cited by plaintiff involve holdings based on language in the contracts which does not appear in the D&O Policy in this case.  Therefore, none of those cases provide authority for plaintiff's position.  Additionally, this case does not involve a claim for loss resulting from a grand jury subpoena for records; it involves a criminal indictment.  I find that the facts of Genova, discussed above, are nearly identical to the

18

facts of this case, and the reasoning of that court is persuasive.

Based on all of the above, I find that plaintiff has suffered no "claim for loss" which would trigger coverage under the D&O Policy. Therefore, defendant's motion for summary judgment on this basis will be granted, and plaintiff's motion for partial summary judgment on this basis will be denied.

## V.  *EXCLUSION 2*

If it had been the case that the criminal indictment constituted a claim for loss for purposes of triggering coverage under the D&O Policy, then the exclusions listed in Section IV of the policy would apply. Section IV provides that KBS "shall not be liable to make any payment or provide any defense in connection with any claim for Loss made against the Bank or Directors or Officers or Employees" for certain reasons. Plaintiff argues that none of the exclusions apply because she did not suffer a claim for loss. As discussed above, no claim for loss means no coverage, period. However, if the indictment constituted a claim for loss, then the exclusions must be examined to determine whether they apply to the circumstances of plaintiff's case.

Exclusion 2 provides that KBS shall not be liable to "make any payment or provide any defense" in connection with any claim "based upon or attributable to the Directors or Officers of

19

Employees gaining in fact any personal profit or advantage to which they were not legally entitled".

In TIG Specialty Insurance Co. v. Pinkmonkey.com, Inc., 375 F.3d 365 (5th Cir. 2004), a D&O policy insurer brought a declaratory judgment action seeking a determination that it was not liable for state court judgments obtained by investors. The "personal profit" exclusion in the contract used the same language as the personal profit exclusion in the contract in this case. The district court in Pinkmonkey.com found that the CEO, Patrick Greene, personally profited from the sale of stock to the investors. On appeal, the Fifth Circuit affirmed.

> For the Personal Profit Exclusion to apply to Greene, the Chee parties' claims must be based upon, arising from, or in consequence of his: (1) having gained in fact any personal profit, remuneration, or advantage; (2) to which he was not legally entitled. See Insurance Policy § III.L. . . .
>
> . . . [A] majority shareholder in a small startup company gains a personal advantage from a sizeable capital investment in the company because it gives the majority shareholder the opportunity to become the owner of a successful business. Here, Greene was the majority shareholder in PinkMonkey, a small startup with only four employees that operated out of a garage. Greene was also the chairman and chief executive of PinkMonkey. As in Jarvis, Greene gained a personal advantage from the opportunity to own and participate in a successful business when PinkMonkey was infused with capital as a result of his fraud.
>
> A defendant is not legally entitled to an advantage or profit resulting from his violation of law if he could be required to return such profit. Here, Greene's advantage resulted from his violation of § 27.01. The remedies for a violation of § 27.01 include the equitable remedy of rescission, which requires the return of any money paid. Because return of the capital investment in PinkMonkey could

20

have been required, there was no legal entitlement to the
capital investment.  Greene's fraud resulted in the capital
investment, which lead directly to his personal advantage.
Greene was not legally entitled to profit from his fraud.

Id., 375 F.3d at 370-371.

In Westport Ins. Corp. v. Hanft & Knight, P.C., 523 F. Supp.
2d 444 (M.D. Pa. 2007), an insurance company sought a declaratory
judgment of no duty to defend or indemnify the insured law firm
and the estate of an insured attorney who had been member of the
firm, under a claims-made professional liability insurance
policy, against lender-clients' claims, including breach of
contract and breach of fiduciary duty, arising out of the
attorney's obtaining loans through false representations.  The
insurance company's motion for summary judgment was granted:

Exclusion D of the Westport policy provides that the policy
"shall not apply to any Claim based upon, arising out of,
attributable to, or directly or indirectly resulting from
any Insured having gained in fact any personal profit or
advantage to which he or she was not legally entitled."  For
the reasons that follow, we find that this exclusion bars
coverage for the underlying action.

The underlying complaint alleges that Hanft, an insured
under the Westport policy, induced the Diehls to loan him a
large amount of money through fraudulent representations and
abuse of the attorney-client relationship.  The underlying
complaint alleges that Hanft used this money to gamble at
casinos and satisfy his gambling debts.  Finally, the
complaint alleges that the Diehls received nothing of value
for their loans, "which [Hanft] never intended to repay or,
in the alternative, believed he could repay only because of
a [sic] unreasonable disregard for the truth that was so
reckless as to amount to conscious deception."  These
allegations clearly demonstrate that Hanft gained personal
profit to which he was not legally entitled through the
wrongful acts from which the underlying claim arises.

21

The Diehls argue that this exclusion does not apply for a number of reasons. First, the Diehls claim that the loans made to Hanft were a debt to be repaid, not a profit, and that Hanft did not profit because he was attempting to repay the loans, which were not due in full until a year after his death. The Diehls' argument is belied by their own allegations in the underlying complaint that Hanft "never intended to repay" the loans. Further, the underlying complaint states that, over seven years, Hanft made only a single payment of $10,000 toward the almost $800,000 owed to the Diehls. The allegations of the underlying complaint show that Hanft took money for personal use with no intention of repaying it. The exclusion therefore bars coverage.

Id. at 454.

Plaintiff argues that neither of these cases, cited by defendant in its motion, are applicable. I disagree. The cases establish that "personal profit or advantage" is not merely stealing. In the Pinkmonkey.com case, the personal profit or advantage consisted of the ability to become part of a successful business through others' investments. In the Hanft & Knight case, the personal profit or advantage was the use of a loan which was never intended to be repaid, even though the payments were not yet due. The cases establish that the definition of personal profit or advantage is broader than merely taking money to which one is not entitled.

Plaintiff's argument on this exclusion is simply that the personal profit or advantage was alleged in the indictment, but she was acquitted of those counts and so those allegations do not matter. Plaintiff's argument is without merit. Not only does she fail to cite any cases which so hold, she fails to

22

acknowledge the body of case law that establishes that

*allegations* trigger a duty to defend, not the final decision.

> In examining the duty to defend, the general rule is that
> the allegations in the pleadings against the insured
> determine the insurer's duty to defend. <u>Murphy Oil USA,</u>
> <u>Inc., v. Unigard Security Insurance Co.</u>, 347 Ark. 167, 175-
> 76 (2001) (citations omitted). Additionally, the duty to
> defend is broader than the duty to indemnify. <u>Id</u>. The duty
> to defend arises when there is a possibility that the injury
> or damage may fall within the policy coverage. <u>Id</u>. <u>See</u>
> <u>also</u>, <u>Madden v. Cont'l Cas. Co.</u>, 53 Ark. App. 250, 254
> (1996) ("It is the allegations made against the insured,
> however groundless, false, or fraudulent such allegations
> may be, that determine the duty of the insurer to defend the
> litigation against its insured.").

<u>Homebank of Arkansas v. Kansas Bankers Surety Company</u>, 2008 WL

2704670 (E.D. Ark. 2008).[4]

> <u>See also</u> <u>Clemons Timber, Inc. v. American Interstate Ins.</u>

<u>Co.</u>, 2009 Ark. App. 232 (2009), 2009 WL 864051 (Apr. 1, 2009):

> In deciding whether an insurer has a duty to defend, we look
> to the allegations made against the insured in the
> underlying lawsuit. <u>See</u> <u>Parker v. Southern Farm Bureau Cas.</u>
> <u>Ins. Co.</u>, --- Ark.App. ----, --- S.W.3d ---- (Feb. 4, 2009).
> It is the pleadings against the insured that determine the
> insurer's duty to defend. <u>See</u> <u>Madden v. Continental Cas.</u>
> <u>Co.</u>, 53 Ark. App. 250, 922 S.W.2d 731 (1996). . . . The
> duty to defend is broader than the duty to indemnify and
> arises where there is a possibility that the damages sought
> against the insured may fall within policy coverage.
> <u>Madden</u>, <u>supra</u>.

> In <u>Murphy Oil USA, Inc. v. Unigard Security Ins. Co.</u>, 347

Ark. 167, 175-176 (Ark. 2001), the Arkansas Supreme Court held

---

[4]Plaintiff actually cites this case in support of her
argument that the insurance company has a duty to defend in this
case. However, <u>Homebank</u> involved a civil suit, not a criminal
indictment.

23

that:

> In examining the duty to defend, this court has recognized the general rule that the allegations in the pleadings against the insured determine the insurer's duty to defend. See <u>Mattson v. St. Paul Title Co. of the South</u>, 277 Ark. 290 (1982); <u>Fox Hills Country Club, Inc. v. American Ins. Co.</u>, 264 Ark. 239 (1978); <u>Commercial Union Ins. Co. of America v. Henshall</u>, 262 Ark. 117 (1977). Additionally, this court has recognized that the duty to defend is broader than the duty to indemnify. See <u>Commercial Union Ins. Co. of America v. Henshall</u>, supra. However, the duty to defend arises when there is a possibility that the injury or damage may fall within the policy coverage. See <u>Home Indemnity Co. v. City of Marianna</u>, 291 Ark. 610 (1987). Conversely, ***where there is no possibility that the damage alleged in the complaint may fall within the policy coverage, there would be no duty to defend***. See C.T. Drechsler, Annotation, Allegations in Third Person's Action Against Insured as Determining Liability Insurer's Duty to Defend, 50 A.L.R.2d 458 (1956).

(Emphasis added).

In this case the underlying lawsuit, i.e., the federal indictment, includes allegations that plaintiff's actions were designed to "directly and indirectly enrich [Wintermute]. . .": that her actions were designed to "fraudulently enrich" her personally; that her actions were designed to allow her to fraudulently use the assets of Sinclair National Bank for her own benefit; that she intended to defraud Sinclair National Bank and the Office of the Comptroller of Currency; and that she intended to injure and defraud Sinclair National Bank by embezzling, abstracting, purloining and misapplying monies, funds, and credits belonging to Sinclair National Bank. These allegations fall squarely within the provisions of Exclusion No. 2 which

24

states that there shall be no coverage under the D&O Policy for acts "based upon or attributable to the Directors or Officers or Employees gaining in fact any personal profit or advantage to which they were not legally entitled." Because the allegations, and not the outcome of the underlying lawsuit, govern the duty to defend, I find that Exclusion No. 2 applies and that defendant's motion for summary judgment on this basis will be granted.

## VII. EXCLUSION 11

Exclusion 11 provides that no coverage exists when the claim for loss is "brought about or contributed to by the dishonesty of the Directors or Officers or Employees." Dishonesty is not defined in the D&O Policy. However, the meaning of dishonesty in the plain, ordinary, and popular sense includes fraud. The American Heritage Dictionary defines dishonest as "disposed to lie, cheat, defraud, or deceive."

The Arkansas Supreme Court has held that "fraud is relevant to indicate a dishonest character." Rhodes v. State, 276 Ark. 203, 214 (1982). In First Nat'l Bank Holding Co. v. Fidelity & Deposit Company of Maryland, 885 F.Supp. 1533, 1537 (N.D. Fla. 1995), Jernagan, CEO of a bank, pled guilty to conspiracy to commit bank fraud, two counts of bank fraud, making a false statement on a bank document, and violation of the currency reporting requirements. When multiple civil suits were brought as a result, the insurance company sought a declaratory judgment

25

that it had no duty to defend.  The bank argued that the crimes

to which Jernagan pled guilty were "not necessarily crimes of

dishonesty."  The court found that, "This argument is frivolous."

Id. at 214.  Accord, International Surplus Lines Ins. Co. v.

University of Wyoming Research Corp., 850 F. Supp. 1509, 1523-

1524 (D. Wyo. 1994):

> [W]hile it may be entirely clear that the criminal acts
> involved in the cases cited by the plaintiff are per se
> dishonest acts, this in no way implies that a non-criminal
> act cannot be a dishonest act.  Fraud is a civil claim that
> epitomizes the essence of dishonesty.  It is well-settled
> law that a prima facie claim for fraud requires proof of,
> inter alia, a false representation.  A false representation
> is, by definition, an act that "deviates from probity."
> Under these circumstances, the Court finds that the first
> component of [the dishonesty] exclusion is satisfied by the
> fact that CFA asserted a claim against WRI for fraudulent
> inducement.

As was the case in relation to Exclusion No. 2 discussed

above, the allegations of the criminal indictment trigger the

duty to defend, not the outcome.  The allegations in counts 7 and

8 include bank fraud.  The allegations in counts 4 and 6 allege

that plaintiff acted with the intent to defraud.  Clearly the

dishonesty exclusion applies in this case.

The cases cited by plaintiff are wholly inapposite as the

contracts in those cases include a provision that the dishonesty

be determined "by a judgment or other final adjudication" as

opposed to merely by allegations.  That clause does not appear in

the D&O Policy in this case.

I find that because the allegations in the underlying lawsuit, i.e., the criminal indictment, are based on plaintiff's dishonesty, there was no duty to defend under Exclusion No. 11. As a result, defendant's motion for summary judgment on this basis will be granted.

## VIII. CONCLUSION

Based on all of the above, I find that because plaintiff has not suffered a claim for loss, there is no coverage under the D&O Policy.  Alternatively, i.e., even if the criminal indictment were determined to constitute a claim for loss, I find that (1) because the allegations in the indictment are based on or attributable to plaintiff's gaining in fact any personal profit or advantage to which she was not legally entitled, Exclusion No. 2 applies; and (2) because the allegations in the indictment are based on plaintiff's dishonesty, Exclusion No. 11 applies. Therefore, it is

ORDERED that defendant's motion for summary judgment is granted.  It is further

ORDERED that plaintiff's motion for partial summary judgment is denied.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 2, 2009

27